# GARCIA *v.* SAN ANTONIO METROPOLITAN TRANSIT AUTHORITY ET AL.

No. 82–1913.   Argued March 19, 1984—Reargued October 1, 1984—
Decided February 19, 1985*

*Together with No. 82–1951, *Donovan, Secretary of Labor* v. *San Antonio Metropolitan Transit Authority et al.*, also on appeal from the same court.

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, and STEVENS, JJ., joined. POWELL, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST and O'CONNOR, JJ., joined, *post*, p. 557. REHNQUIST, J., filed a dissenting opinion, *post*, p. 579. O'CONNOR, J., filed a dissenting opinion, in which POWELL and REHNQUIST, JJ., joined, *post*, p. 580.

*Solicitor General Lee* reargued the cause and filed briefs on reargument for appellant in No. 82–1951. *Assistant Attorney General Olson* argued the cause for appellants in both cases on the original argument. With him on the briefs on the original argument were Mr. Lee, *Assistant Attorney General McGrath, Deputy Solicitor General Geller, Joshua I. Schwartz, Michael F. Hertz,* and *Douglas Letter. Laurence Gold* reargued the cause for appellant in No. 82–1913. With him on the briefs were *Earle Putnam, Linda R. Hirshman, Robert Chanin,* and *George Kaufmann.*

*William T. Coleman, Jr.,* reargued the cause for appellees in both cases. With him on the briefs for appellee American Public Transit Association were *Donald T. Bliss* and *Zoë E. Baird. George P. Parker, Jr.,* filed briefs for appellee San Antonio Metropolitan Transit Authority.†

---

†Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by the Attorneys General of their respective States as follows: *Francis X. Bellotti* of Massachusetts, *John K. Van de Kamp* of California, *Joseph I. Lieberman* of Connecticut, *Michael A. Lilly* of Hawaii, *Neil F. Hartigan* of Illinois, *Linley E. Pearson* of Indiana, *Robert T. Stephen* of Kansas, *David L. Armstrong* of Kentucky, *William J. Guste, Jr.,* of Louisiana, *Stephen H. Sachs* of Maryland, *Hubert H. Humphrey III* of Minnesota, *John Ashcroft* of Missouri, *Michael P. Greely* of Montana, *Paul L. Douglas* of Nebraska, *Gregory H. Smith* of New Hampshire, *Irwin I. Kimmelman* of New Jersey, *LeRoy Zimmerman* of Pennsylvania, *T. Travis Medlock* of South Carolina, *David Wilkinson* of Utah, *John J. Easton, Jr.,* of Vermont, *Gerald L. Baliles* of Virginia, *Chauncey H. Browning* of West Virginia, *Bronson C. La Follette* of Wisconsin, and *A. G. McClintock* of Wyoming; for the Colorado Public Employees'

JUSTICE BLACKMUN delivered the opinion of the Court.

We revisit in these cases an issue raised in *National League of Cities* v. *Usery*, 426 U. S. 833 (1976). In that litigation, this Court, by a sharply divided vote, ruled that the Commerce Clause does not empower Congress to enforce the minimum-wage and overtime provisions of the Fair Labor Standards Act (FLSA) against the States "in areas of traditional governmental functions." *Id.*, at 852. Although *National League of Cities* supplied some examples of "traditional governmental functions," it did not offer a general explanation of how a "traditional" function is to be distinguished from a "nontraditional" one. Since then, federal and state courts have struggled with the task, thus imposed, of identifying a traditional function for purposes of state immunity under the Commerce Clause.

In the present cases, a Federal District Court concluded that municipal ownership and operation of a mass-transit system is a traditional governmental function and thus, under *National League of Cities*, is exempt from the obligations imposed by the FLSA. Faced with the identical question, three Federal Courts of Appeals and one state appellate court have reached the opposite conclusion.[1]

---

Retirement Association by *Endicott Peabody* and *Jeffrey N. Martin;* for the Legal Foundation of America by *David Crump;* for the National Institute of Municipal Law Officers by *John W. Witt, Roger F. Cutler, Benjamin L. Brown, J. Lamar Shelley, William H. Taube, William I. Thornton, Jr., Henry W. Underhill, Jr., Charles S. Rhyne, Roy D. Bates, George Agnost, Robert J. Alfton, James K. Baker,* and *Clifford D. Pierce, Jr.;* for the National League of Cities et al. by *Lawrence R. Velvel* and *Elaine Kaplan;* and for the National Public Employer Labor Relations Association et al. by *R. Theodore Clark, Jr.*

[1] See *Dove* v. *Chattanooga Area Regional Transportation Authority,* 701 F. 2d 50 (CA6 1983), cert. pending *sub nom. City of Macon* v. *Joiner,* No. 82–1974; *Alewine* v. *City Council of Augusta, Ga.,* 699 F. 2d 1060 (CA11 1983), cert. pending, No. 83–257; *Kramer* v. *New Castle Area Transit Authority,* 677 F. 2d 308 (CA3 1982), cert. denied, 459 U. S. 1146 (1983); *Francis* v. *City of Tallahassee,* 424 So. 2d 61 (Fla. App. 1982).

Our examination of this "function" standard applied in these and other cases over the last eight years now persuades us that the attempt to draw the boundaries of state regulatory immunity in terms of "traditional governmental function" is not only unworkable but is also inconsistent with established principles of federalism and, indeed, with those very federalism principles on which *National League of Cities* purported to rest. That case, accordingly, is overruled.

## I

The history of public transportation in San Antonio, Tex., is characteristic of the history of local mass transit in the United States generally. Passenger transportation for hire within San Antonio originally was provided on a private basis by a local transportation company. In 1913, the Texas Legislature authorized the State's municipalities to regulate vehicles providing carriage for hire. 1913 Tex. Gen. Laws, ch. 147, §4, ¶12, now codified, as amended, as Tex. Rev. Civ. Stat. Ann., Art. 1175, §§20 and 21 (Vernon 1963). Two years later, San Antonio enacted an ordinance setting forth franchising, insurance, and safety requirements for passenger vehicles operated for hire. The city continued to rely on such publicly regulated private mass transit until 1959, when it purchased the privately owned San Antonio Transit Company and replaced it with a public authority known as the San Antonio Transit System (SATS). SATS operated until 1978, when the city transferred its facilities and equipment to appellee San Antonio Metropolitan Transit Authority (SAMTA), a public mass-transit authority organized on a countywide basis. See generally Tex. Rev. Civ. Stat. Ann., Art. 1118x (Vernon Supp. 1984). SAMTA currently is the major provider of transportation in the San Antonio metropolitan area; between 1978 and 1980 alone, its vehicles traveled over 26 million route miles and carried over 63 million passengers.

As did other localities, San Antonio reached the point where it came to look to the Federal Government for financial assistance in maintaining its public mass transit. SATS managed to meet its operating expenses and bond obligations for the first decade of its existence without federal or local financial aid. By 1970, however, its financial position had deteriorated to the point where federal subsidies were vital for its continued operation. SATS' general manager that year testified before Congress that "if we do not receive substantial help from the Federal Government, San Antonio may . . . join the growing ranks of cities that have inferior [public] transportation or may end up with no [public] transportation at all."[2]

The principal federal program to which SATS and other mass-transit systems looked for relief was the Urban Mass Transportation Act of 1964 (UMTA), Pub. L. 88–365, 78 Stat. 302, as amended, 49 U. S. C. App. § 1601 *et seq.*, which provides substantial federal assistance to urban mass-transit programs. See generally *Jackson Transit Authority* v. *Transit Union*, 457 U. S. 15 (1982). UMTA now authorizes the Department of Transportation to fund 75 percent of the capital outlays and up to 50 percent of the operating expenses of qualifying mass-transit programs. §§ 4(a), 5(d) and (e), 49 U. S. C. App. §§ 1603(a), 1604(d) and (e). SATS received its first UMTA subsidy, a $4.1 million capital grant, in December 1970. From then until February 1980, SATS and SAMTA received over $51 million in UMTA grants—more than $31 million in capital grants, over $20 million in operating assistance, and a minor amount in technical assistance. During SAMTA's first two fiscal years, it received $12.5 million in UMTA operating grants, $26.8 million from sales taxes, and only $10.1 million from fares. Federal subsidies

---

[2] Urban Mass Transportation: Hearings on H. R. 6663 et al. before the Subcommittee on Housing of the House Committee on Banking and Currency, 91st Cong., 2d Sess., 419 (1970) (statement of F. Norman Hill).

and local sales taxes currently account for about 75 percent of SAMTA's operating expenses.

The present controversy concerns the extent to which SAMTA may be subjected to the minimum-wage and overtime requirements of the FLSA. When the FLSA was enacted in 1938, its wage and overtime provisions did not apply to local mass-transit employees or, indeed, to employees of state and local governments. §§ 3(d), 13(a)(9), 52 Stat. 1060, 1067. In 1961, Congress extended minimum-wage coverage to employees of any private mass-transit carrier whose annual gross revenue was not less than $1 million. Fair Labor Standards Amendments of 1961, §§ 2(c), 9, 75 Stat. 65, 71. Five years later, Congress extended FLSA coverage to state and local-government employees for the first time by withdrawing the minimum-wage and overtime exemptions from public hospitals, schools, and mass-transit carriers whose rates and services were subject to state regulation. Fair Labor Standards Amendments of 1966, §§ 102(a) and (b), 80 Stat. 831. At the same time, Congress eliminated the overtime exemption for all mass-transit employees other than drivers, operators, and conductors. § 206(c), 80 Stat. 836. The application of the FLSA to public schools and hospitals was ruled to be within Congress' power under the Commerce Clause. *Maryland* v. *Wirtz*, 392 U. S. 183 (1968).

The FLSA obligations of public mass-transit systems like SATS were expanded in 1974 when Congress provided for the progressive repeal of the surviving overtime exemption for mass-transit employees. Fair Labor Standards Amendments of 1974, § 21(b), 88 Stat. 68. Congress simultaneously brought the States and their subdivisions further within the ambit of the FLSA by extending FLSA coverage to virtually all state and local-government employees. §§ 6(a)(1) and (6), 88 Stat. 58, 60, 29 U. S. C. §§ 203(d) and (x). SATS complied with the FLSA's overtime requirements until 1976, when this Court, in *National League of Cities*, overruled *Maryland* v. *Wirtz*, and held that the FLSA could not be

applied constitutionally to the "traditional governmental functions" of state and local governments. Four months after *National League of Cities* was handed down, SATS informed its employees that the decision relieved SATS of its overtime obligations under the FLSA.[3]

Matters rested there until September 17, 1979, when the Wage and Hour Administration of the Department of Labor issued an opinion that SAMTA's operations "are not constitutionally immune from the application of the Fair Labor Standards Act" under *National League of Cities*. Opinion WH–499, 6 LRR 91:1138. On November 21 of that year, SAMTA filed this action against the Secretary of Labor in the United States District Court for the Western District of Texas. It sought a declaratory judgment that, contrary to the Wage and Hour Administration's determination, *National League of Cities* precluded the application of the FLSA's overtime requirements to SAMTA's operations. The Secretary counterclaimed under 29 U. S. C. § 217 for enforcement of the overtime and recordkeeping requirements of the FLSA. On the same day that SAMTA filed its action, appellant Garcia and several other SAMTA employees brought suit against SAMTA in the same District Court for overtime pay under the FLSA. *Garcia* v. *SAMTA*, Civil Action No. SA 79 CA 458. The District Court has stayed that action pending the outcome of these cases, but it allowed Garcia to intervene in the present litigation as a defendant in support of the Secretary. One month after SAMTA brought suit, the Department of Labor formally amended its FLSA interpretive regulations to provide that publicly owned local mass-transit systems are not entitled to immunity under

---

[3] Neither SATS nor SAMTA appears to have attempted to avoid the FLSA's minimum-wage provisions. We are informed that basic wage levels in the mass-transit industry traditionally have been well in excess of the minimum wages prescribed by the FLSA. See Brief for National League of Cities et al. as *Amici Curiae* 7–8.

*National League of Cities.* 44 Fed. Reg. 75630 (1979), codified as 29 CFR § 775.3(b)(3) (1984).

On November 17, 1981, the District Court granted SAMTA's motion for summary judgment and denied the Secretary's and Garcia's cross-motion for partial summary judgment. Without further explanation, the District Court ruled that "local public mass transit systems (including [SAMTA]) constitute integral operations in areas of traditional governmental functions" under *National League of Cities.* App. D to Juris. Statement in No. 82–1913, p. 24a. The Secretary and Garcia both appealed directly to this Court pursuant to 28 U. S. C. § 1252. During the pendency of those appeals, *Transportation Union v. Long Island R. Co.,* 455 U. S. 678 (1982), was decided. In that case, the Court ruled that commuter rail service provided by the state-owned Long Island Rail Road did not constitute a "traditional governmental function" and hence did not enjoy constitutional immunity, under *National League of Cities,* from the requirements of the Railway Labor Act. Thereafter, it vacated the District Court's judgment in the present cases and remanded them for further consideration in the light of *Long Island.* 457 U. S. 1102 (1982).

On remand, the District Court adhered to its original view and again entered judgment for SAMTA. 557 F. Supp. 445 (1983). The court looked first to what it regarded as the "historical reality" of state involvement in mass transit. It recognized that States not always had owned and operated mass-transit systems, but concluded that they had engaged in a longstanding pattern of public regulation, and that this regulatory tradition gave rise to an "inference of sovereignty." *Id.,* at 447–448. The court next looked to the record of federal involvement in the field and concluded that constitutional immunity would not result in an erosion of federal authority with respect to state-owned mass-transit systems, because many federal statutes themselves contain exemptions for States and thus make the withdrawal of fed-

eral regulatory power over public mass-transit systems a supervening federal policy. *Id.*, at 448–450. Although the Federal Government's authority over employee wages under the FLSA obviously would be eroded, Congress had not asserted any interest in the wages of public mass-transit employees until 1966 and hence had not established a long-standing federal interest in the field, in contrast to the century-old federal regulatory presence in the railroad industry found significant for the decision in *Long Island.* Finally, the court compared mass transit to the list of functions identified as constitutionally immune in *National League of Cities* and concluded that it did not differ from those functions in any material respect. The court stated: "If transit is to be distinguished from the exempt *[National League of Cities]* functions it will have to be by identifying a traditional state function in the same way pornography is sometimes identified: someone knows it when they see it, but they can't describe it." 557 F. Supp., at 453.[4]

The Secretary and Garcia again took direct appeals from the District Court's judgment. We noted probable jurisdiction. 464 U. S. 812 (1983). After initial argument, the cases were restored to our calendar for reargument, and the parties were requested to brief and argue the following additional question:

> "Whether or not the principles of the Tenth Amendment as set forth in *National League of Cities* v. *Usery*, 426 U. S. 833 (1976), should be reconsidered?" 468 U. S. 1213 (1984).

Reargument followed in due course.

---

[4] The District Court also analyzed the status of mass transit under the four-part test devised by the Sixth Circuit in *Amersbach* v. *City of Cleveland*, 598 F. 2d 1033 (1979). In that case, the Court of Appeals looked to (1) whether the function benefits the community as a whole and is made available at little or no expense; (2) whether it is undertaken for public service or pecuniary gain; (3) whether government is its principal provider; and (4) whether government is particularly suited to perform it because of a community-wide need. *Id.*, at 1037.

## II

Appellees have not argued that SAMTA is immune from regulation under the FLSA on the ground that it is a local transit system engaged in intrastate commercial activity. In a practical sense, SAMTA's operations might well be characterized as "local." Nonetheless, it long has been settled that Congress' authority under the Commerce Clause extends to intrastate economic activities that affect interstate commerce. See, e. g., Hodel v. Virginia Surface Mining & Recl. Assn., 452 U. S. 264, 276–277 (1981); Heart of Atlanta Motel, Inc. v. United States, 379 U. S. 241, 258 (1964); Wickard v. Filburn, 317 U. S. 111, 125 (1942); United States v. Darby, 312 U. S. 100 (1941). Were SAMTA a privately owned and operated enterprise, it could not credibly argue that Congress exceeded the bounds of its Commerce Clause powers in prescribing minimum wages and overtime rates for SAMTA's employees. Any constitutional exemption from the requirements of the FLSA therefore must rest on SAMTA's status as a governmental entity rather than on the "local" nature of its operations.

The prerequisites for governmental immunity under National League of Cities were summarized by this Court in Hodel, supra. Under that summary, four conditions must be satisfied before a state activity may be deemed immune from a particular federal regulation under the Commerce Clause. First, it is said that the federal statute at issue must regulate "the 'States as States.'" Second, the statute must "address matters that are indisputably 'attribute[s] of state sovereignty.'" Third, state compliance with the federal obligation must "directly impair [the States'] ability 'to structure integral operations in areas of traditional governmental functions.'" Finally, the relation of state and federal interests must not be such that "the nature of the federal interest . . . justifies state submission." 452 U. S., at 287–288, and n. 29, quoting National League of Cities, 426 U. S., at 845, 852, 854.

The controversy in the present cases has focused on the third *Hodel* requirement—that the challenged federal statute trench on "traditional governmental functions." The District Court voiced a common concern: "Despite the abundance of adjectives, identifying which particular state functions are immune remains difficult." 557 F. Supp., at 447. Just how troublesome the task has been is revealed by the results reached in other federal cases. Thus, courts have held that regulating ambulance services, *Gold Cross Ambulance* v. *City of Kansas City,* 538 F. Supp. 956, 967–969 (WD Mo. 1982), aff'd on other grounds, 705 F. 2d 1005 (CA8 1983), cert. pending, No. 83–138; licensing automobile drivers, *United States* v. *Best,* 573 F. 2d 1095, 1102–1103 (CA9 1978); operating a municipal airport, *Amersbach* v. *City of Cleveland,* 598 F. 2d 1033, 1037–1038 (CA6 1979); performing solid waste disposal, *Hybud Equipment Corp.* v. *City of Akron,* 654 F. 2d 1187, 1196 (CA6 1981); and operating a highway authority, *Molina-Estrada* v. *Puerto Rico Highway Authority,* 680 F. 2d 841, 845–846 (CA1 1982), are functions *protected* under *National League of Cities.* At the same time, courts have held that issuance of industrial development bonds, *Woods* v. *Homes and Structures of Pittsburg, Kansas, Inc.,* 489 F. Supp. 1270, 1296–1297 (Kan. 1980); regulation of intrastate natural gas sales, *Oklahoma ex rel. Derryberry* v. *FERC,* 494 F. Supp. 636, 657 (WD Okla. 1980), aff'd, 661 F. 2d 832 (CA10 1981), cert. denied *sub nom. Texas* v. *FERC,* 457 U. S. 1105 (1982); regulation of traffic on public roads, *Friends of the Earth* v. *Carey,* 552 F. 2d 25, 38 (CA2), cert. denied, 434 U. S. 902 (1977); regulation of air transportation, *Hughes Air Corp.* v. *Public Utilities Comm'n of Cal.,* 644 F. 2d 1334, 1340–1341 (CA9 1981); operation of a telephone system, *Puerto Rico Tel. Co.* v. *FCC,* 553 F. 2d 694, 700–701 (CA1 1977); leasing and sale of natural gas, *Public Service Co. of N. C.* v. *FERC,* 587 F. 2d 716, 721 (CA5), cert. denied *sub nom. Louisiana* v. *FERC,* 444 U. S. 879 (1979); operation of a mental health facility, *Williams* v. *Eastside Mental*

*Health Center, Inc.*, 669 F. 2d 671, 680–681 (CA11), cert. denied, 459 U. S. 976 (1982); and provision of in-house domestic services for the aged and handicapped, *Bonnette* v. *California Health and Welfare Agency*, 704 F. 2d 1465, 1472 (CA9 1983), are *not* entitled to immunity. We find it difficult, if not impossible, to identify an organizing principle that places each of the cases in the first group on one side of a line and each of the cases in the second group on the other side. The constitutional distinction between licensing drivers and regulating traffic, for example, or between operating a highway authority and operating a mental health facility, is elusive at best.

Thus far, this Court itself has made little headway in defining the scope of the governmental functions deemed protected under *National League of Cities*. In that case the Court set forth examples of protected and unprotected functions, see 426 U. S., at 851, 854, n. 18, but provided no explanation of how those examples were identified. The only other case in which the Court has had occasion to address the problem is *Long Island*.[5] We there observed: "The determination of whether a federal law impairs a state's authority with respect to 'areas of traditional [state] functions' may at times be a difficult one." 455 U. S., at 684, quoting *National League of Cities*, 426 U. S., at 852. The accuracy of that statement is demonstrated by this Court's own difficulties in *Long Island* in developing a workable standard for "traditional governmental functions." We relied in large part there on "the *historical reality* that the operation of railroads is not among the functions *traditionally* performed by state and local governments," but we

---

[5] See also, however, *Jefferson County Pharmaceutical Assn.* v. *Abbott Laboratories*, 460 U. S. 150, 154, n. 6 (1983); *FERC* v. *Mississippi*, 456 U. S. 742, 781, and n. 7 (1982) (opinion concurring in judgment in part and dissenting in part); *Fry* v. *United States*, 421 U. S. 542, 558, and n. 2 (1975) (dissenting opinion).

simultaneously disavowed "a static historical view of state functions generally immune from federal regulation." 455 U. S., at 686 (first emphasis added; second emphasis in original). We held that the inquiry into a particular function's "traditional" nature was merely a means of determining whether the federal statute at issue unduly handicaps "basic state prerogatives," *id.*, at 686–687, but we did not offer an explanation of what makes one state function a "basic prerogative" and another function not basic. Finally, having disclaimed a rigid reliance on the historical pedigree of state involvement in a particular area, we nonetheless found it appropriate to emphasize the extended historical record of *federal* involvement in the field of rail transportation. *Id.*, at 687–689.

Many constitutional standards involve "undoubte[d] . . . gray areas," *Fry* v. *United States*, 421 U. S. 542, 558 (1975) (dissenting opinion), and, despite the difficulties that this Court and other courts have encountered so far, it normally might be fair to venture the assumption that case-by-case development would lead to a workable standard for determining whether a particular governmental function should be immune from federal regulation under the Commerce Clause. A further cautionary note is sounded, however, by the Court's experience in the related field of state immunity from federal taxation. In *South Carolina* v. *United States*, 199 U. S. 437 (1905), the Court held for the first time that the state tax immunity recognized in *Collector* v. *Day*, 11 Wall. 113 (1871), extended only to the "ordinary" and "strictly governmental" instrumentalities of state governments and not to instrumentalities "used by the State in the carrying on of an ordinary private business." 199 U. S., at 451, 461. While the Court applied the distinction outlined in *South Carolina* for the following 40 years, at no time during that period did the Court develop a consistent formulation of the kinds of governmental functions that were entitled to immunity. The Court identified the protected functions at various times as "essential," "usual," "traditional," or "strictly gov-

ernmental."[6]   While "these differences in phraseology . . . must not be too literally contradistinguished," *Brush* v. *Commissioner*, 300 U. S. 352, 362 (1937), they reflect an inability to specify precisely what aspects of a governmental function made it necessary to the "unimpaired existence" of the States.   *Collector* v. *Day*, 11 Wall., at 127.   Indeed, the Court ultimately chose "not, by an attempt to formulate any general test, [to] risk embarrassing the decision of cases [concerning] activities of a different kind which may arise in the future."   *Brush* v. *Commissioner,* 300 U. S., at 365.

If these tax-immunity cases had any common thread, it was in the attempt to distinguish between "governmental" and "proprietary" functions.[7]   To say that the distinction be-

---

[6] See *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, 172 (1911) ("essential"); *Helvering* v. *Therrell*, 303 U. S. 218, 225 (1938) (same); *Helvering* v. *Powers*, 293 U. S. 214, 225 (1934) ("usual"); *United States* v. *California*, 297 U. S. 175, 185 (1936) ("activities in which the states have traditionally engaged"); *South Carolina* v. *United States*, 199 U. S. 437, 461 (1905) ("strictly governmental").

[7] In *South Carolina*, the Court relied on the concept of "strictly governmental" functions to uphold the application of a federal liquor license tax to a state-owned liquor-distribution monopoly.   In *Flint*, the Court stated: "The true distinction is between . . . those operations of the States essential to the execution of its *[sic]* governmental functions, and which the State can only do itself, and those activities which are of a private character"; under this standard, "[i]t is no part of the essential governmental functions of a State to provide means of transportation, supply artificial light, water and the like."   220 U. S., at 172.   In *Ohio* v. *Helvering*, 292 U. S. 360 (1934), another case involving a state liquor-distribution monopoly, the Court stated that "the business of buying and selling commodities . . . is not the performance of a governmental function," and that "[w]hen a state enters the market place seeking customers it divests itself of its *quasi* sovereignty *pro tanto*, and takes on the character of a trader, so far, at least, as the taxing power of the federal government is concerned."   *Id.*, at 369.   In *Powers*, the Court upheld the application of the federal income tax to the income of trustees of a state-operated commuter railroad; the Court reiterated that "the State cannot withdraw sources of revenue from the federal taxing power by engaging in businesses which constitute a departure from usual governmental functions and to which, by reason of their nature, the federal taxing power would normally extend," regardless of the

tween "governmental" and "proprietary" proved to be stable, however, would be something of an overstatement. In 1911, for example, the Court declared that the provision of a municipal water supply "is no part of the essential governmental functions of a State." *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, 172. Twenty-six years later, without any intervening change in the applicable legal standards, the Court simply rejected its earlier position and decided that the provision of a municipal water supply *was* immune from federal taxation as an essential governmental function, even though municipal waterworks long had been operated for profit by private industry. *Brush* v. *Commissioner*, 300 U. S., at 370–373. At the same time that the Court was holding a municipal water supply to be immune from federal taxes, it had held that a state-run commuter rail system was *not* immune. *Helvering* v. *Powers*, 293 U. S. 214 (1934). Justice Black, in *Helvering* v. *Gerhardt*, 304 U. S. 405, 427 (1938), was moved to observe: "An implied constitutional distinction which taxes income of an officer of a state-operated transportation system and exempts income of the manager of a municipal water works system manifests the uncertainty created by the 'essential' and 'non-essential' test" (concurring opinion). It was this uncertainty and instability that led the Court shortly thereafter, in *New York* v. *United States*, 326 U. S. 572 (1946), unanimously to conclude that the distinction between "governmental" and "proprietary" functions was "untenable" and must be abandoned. See *id.*, at 583 (opinion of Frankfurter, J., joined by Rutledge, J.); *id.*, at 586 (Stone, C. J., concurring, joined by Reed, Murphy, and Burton, JJ.); *id.*, at 590–596 (Douglas, J., dissenting, joined by Black, J.). See also *Massachusetts* v. *United States*, 435 U. S. 444, 457, and n. 14 (1978) (plurality opinion); *Case* v. *Bowles*, 327 U. S. 92, 101 (1946).

---

fact that the proprietary enterprises "are undertaken for what the State conceives to be the public benefit." 293 U. S., at 225. Accord, *Allen* v. *Regents*, 304 U. S. 439, 451–453 (1938).

Even during the heyday of the governmental/proprietary distinction in intergovernmental tax-immunity doctrine the Court never explained the constitutional basis for that distinction. In *South Carolina*, it expressed its concern that unlimited state immunity from federal taxation would allow the States to undermine the Federal Government's tax base by expanding into previously private sectors of the economy. See 199 U. S., at 454–455.[8] Although the need to reconcile state and federal interests obviously demanded that state immunity have some limiting principle, the Court did not try to justify the particular result it reached; it simply concluded that a "line [must] be drawn," *id.*, at 456, and proceeded to draw that line. The Court's elaborations in later cases, such as the assertion in *Ohio* v. *Helvering*, 292 U. S. 360, 369 (1934), that "[w]hen a state enters the market place seeking customers it divests itself of its *quasi* sovereignty *pro tanto*," sound more of *ipse dixit* than reasoned explanation. This inability to give principled content to the distinction between "governmental" and "proprietary," no less significantly than its unworkability, led the Court to abandon the distinction in *New York* v. *United States*.

The distinction the Court discarded as unworkable in the field of tax immunity has proved no more fruitful in the field of regulatory immunity under the Commerce Clause. Neither do any of the alternative standards that might be employed to distinguish between protected and unprotected governmental functions appear manageable. We rejected the possibility of making immunity turn on a purely historical standard of "tradition" in *Long Island*, and properly so. The most obvious defect of a historical approach to state immunity is that it prevents a court from accommodating changes in the historical functions of States, changes that have re-

---

[8] That concern was especially weighty in *South Carolina* because liquor taxes, the object of the dispute in that case, then accounted for over one-fourth of the Federal Government's revenues. See *New York* v. *United States*, 326 U. S. 572, 598, n. 4 (1946) (dissenting opinion).

sulted in a number of once-private functions like education being assumed by the States and their subdivisions.[9] At the same time, the only apparent virtue of a rigorous historical standard, namely, its promise of a reasonably objective measure for state immunity, is illusory. Reliance on history as an organizing principle results in line-drawing of the most arbitrary sort; the genesis of state governmental functions stretches over a historical continuum from before the Revolution to the present, and courts would have to decide by fiat precisely how longstanding a pattern of state involvement had to be for federal regulatory authority to be defeated.[10]

---

[9] Indeed, the "traditional" nature of a particular governmental function can be a matter of historical nearsightedness; today's self-evidently "traditional" function is often yesterday's suspect innovation. Thus, *National League of Cities* offered the provision of public parks and recreation as an example of a traditional governmental function. 426 U. S., at 851. A scant 80 years earlier, however, in *Shoemaker* v. *United States*, 147 U. S. 282 (1893), the Court pointed out that city commons originally had been provided not for recreation but for grazing domestic animals "in common," and that "[i]n the memory of men now living, a proposition to take private property [by eminent domain] for a public park . . . would have been regarded as a novel exercise of legislative power." *Id.*, at 297.

[10] For much the same reasons, the existence *vel non* of a tradition of *federal* involvement in a particular area does not provide an adequate standard for state immunity. Most of the Federal Government's current regulatory activity originated less than 50 years ago with the New Deal, and a good portion of it has developed within the past two decades. The recent vintage of this regulatory activity does not diminish the strength of the federal interest in applying regulatory standards to state activities, nor does it affect the strength of the States' interest in being free from federal supervision. Although the Court's intergovernmental tax-immunity decisions ostensibly have subjected particular state activities to federal taxation because those activities "ha[ve] been traditionally within [federal taxing] power from the beginning," *New York* v. *United States*, 326 U. S., at 588 (Stone, C. J., concurring, joined by Reed, Murphy, and Burton, JJ.), the Court has not in fact required federal taxes to have long historical records in order to be effective. The income tax at issue in *Powers, supra,* took effect less than a decade before the tax years for which it was challenged, while the federal tax whose application was

A nonhistorical standard for selecting immune governmental functions is likely to be just as unworkable as is a historical standard. The goal of identifying "uniquely" governmental functions, for example, has been rejected by the Court in the field of government tort liability in part because the notion of a "uniquely" governmental function is unmanageable. See *Indian Towing Co.* v. *United States*, 350 U. S. 61, 64–68 (1955); see also *Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S. 389, 433 (1978) (dissenting opinion). Another possibility would be to confine immunity to "necessary" governmental services, that is, services that would be provided inadequately or not at all unless the government provided them. Cf. *Flint* v. *Stone Tracy Co.*, 220 U. S., at 172. The set of services that fits into this category, however, may well be negligible. The fact that an unregulated market produces less of some service than a State deems desirable does not mean that the State itself must provide the service; in most if not all cases, the State can "contract out" by hiring private firms to provide the service or simply by providing subsidies to existing suppliers. It also is open to question how well equipped courts are to make this kind of determination about the workings of economic markets.

We believe, however, that there is a more fundamental problem at work here, a problem that explains why the Court was never able to provide a basis for the governmental/proprietary distinction in the intergovernmental tax-immunity cases and why an attempt to draw similar distinctions with respect to federal regulatory authority under *National League of Cities* is unlikely to succeed regardless of how the distinctions are phrased. The problem is that neither the governmental/proprietary distinction nor any

upheld in *New York* v. *United States* took effect in 1932 and was rescinded less than two years later. See *Helvering* v. *Powers*, 293 U. S., at 222; Rakestraw, The Reciprocal Rule of Governmental Tax Immunity—A Legal Myth, 11 Fed. Bar J. 3, 34, n. 116 (1950).

other that purports to separate out important governmental functions can be faithful to the role of federalism in a democratic society. The essence of our federal system is that within the realm of authority left open to them under the Constitution, the States must be equally free to engage in any activity that their citizens choose for the common weal, no matter how unorthodox or unnecessary anyone else— including the judiciary—deems state involvement to be. Any rule of state immunity that looks to the "traditional," "integral," or "necessary" nature of governmental functions inevitably invites an unelected federal judiciary to make decisions about which state policies it favors and which ones it dislikes. "The science of government . . . is the science of experiment," *Anderson* v. *Dunn*, 6 Wheat. 204, 226 (1821), and the States cannot serve as laboratories for social and economic experiment, see *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 311 (1932) (Brandeis, J., dissenting), if they must pay an added price when they meet the changing needs of their citizenry by taking up functions that an earlier day and a different society left in private hands. In the words of Justice Black:

> "There is not, and there cannot be, any unchanging line of demarcation between essential and non-essential governmental functions. Many governmental functions of today have at some time in the past been non-governmental. The genius of our government provides that, within the sphere of constitutional action, the people—acting not through the courts but through their elected legislative representatives—have the power to determine as conditions demand, what services and functions the public welfare requires." *Helvering* v. *Gerhardt*, 304 U. S., at 427 (concurring opinion).

We therefore now reject, as unsound in principle and unworkable in practice, a rule of state immunity from federal regulation that turns on a judicial appraisal of whether a

particular governmental function is "integral" or "traditional." Any such rule leads to inconsistent results at the same time that it disserves principles of democratic self-governance, and it breeds inconsistency precisely because it is divorced from those principles. If there are to be limits on the Federal Government's power to interfere with state functions—as undoubtedly there are—we must look elsewhere to find them. We accordingly return to the underlying issue that confronted this Court in *National League of Cities*—the manner in which the Constitution insulates States from the reach of Congress' power under the Commerce Clause.

## III

The central theme of *National League of Cities* was that the States occupy a special position in our constitutional system and that the scope of Congress' authority under the Commerce Clause must reflect that position. Of course, the Commerce Clause by its specific language does not provide any special limitation on Congress' actions with respect to the States. See *EEOC* v. *Wyoming*, 460 U. S. 226, 248 (1983) (concurring opinion). It is equally true, however, that the text of the Constitution provides the beginning rather than the final answer to every inquiry into questions of federalism, for "[b]ehind the words of the constitutional provisions are postulates which limit and control." *Monaco* v. *Mississippi*, 292 U. S. 313, 322 (1934). *National League of Cities* reflected the general conviction that the Constitution precludes "the National Government [from] devour[ing] the essentials of state sovereignty." *Maryland* v. *Wirtz*, 392 U. S., at 205 (dissenting opinion). In order to be faithful to the underlying federal premises of the Constitution, courts must look for the "postulates which limit and control."

What has proved problematic is not the perception that the Constitution's federal structure imposes limitations on the Commerce Clause, but rather the nature and content of those limitations. One approach to defining the limits on Con-

gress' authority to regulate the States under the Commerce Clause is to identify certain underlying elements of political sovereignty that are deemed essential to the States' "separate and independent existence." *Lane County* v. *Oregon*, 7 Wall. 71, 76 (1869). This approach obviously underlay the Court's use of the "traditional governmental function" concept in *National League of Cities.* It also has led to the separate requirement that the challenged federal statute "address matters that are indisputably 'attribute[s] of state sovereignty.'" *Hodel*, 452 U. S., at 288, quoting *National League of Cities*, 426 U. S., at 845. In *National League of Cities* itself, for example, the Court concluded that decisions by a State concerning the wages and hours of its employees are an "undoubted attribute of state sovereignty." 426 U. S., at 845. The opinion did not explain what aspects of such decisions made them such an "undoubted attribute," and the Court since then has remarked on the uncertain scope of the concept. See *EEOC* v. *Wyoming*, 460 U. S., at 238, n. 11. The point of the inquiry, however, has remained to single out particular features of a State's internal governance that are deemed to be intrinsic parts of state sovereignty.

We doubt that courts ultimately can identify principled constitutional limitations on the scope of Congress' Commerce Clause powers over the States merely by relying on *a priori* definitions of state sovereignty. In part, this is because of the elusiveness of objective criteria for "fundamental" elements of state sovereignty, a problem we have witnessed in the search for "traditional governmental functions." There is, however, a more fundamental reason: the sovereignty of the States is limited by the Constitution itself. A variety of sovereign powers, for example, are withdrawn from the States by Article I, § 10. Section 8 of the same Article works an equally sharp contraction of state sovereignty by authorizing Congress to exercise a wide range of legislative powers and (in conjunction with the Supremacy Clause of Article VI) to displace contrary state legislation. See

*Hodel,* 452 U. S., at 290–292. By providing for final review of questions of federal law in this Court, Article III curtails the sovereign power of the States' judiciaries to make authoritative determinations of law. See *Martin* v. *Hunter's Lessee,* 1 Wheat. 304 (1816). Finally, the developed application, through the Fourteenth Amendment, of the greater part of the Bill of Rights to the States limits the sovereign authority that States otherwise would possess to legislate with respect to their citizens and to conduct their own affairs.

The States unquestionably do "retai[n] a significant measure of sovereign authority." *EEOC* v. *Wyoming,* 460 U. S., at 269 (POWELL, J., dissenting). They do so, however, only to the extent that the Constitution has not divested them of their original powers and transferred those powers to the Federal Government. In the words of James Madison to the Members of the First Congress: "Interference with the power of the States was no constitutional criterion of the power of Congress. If the power was not given, Congress could not exercise it; if given, they might exercise it, although it should interfere with the laws, or even the Constitution of the States." 2 Annals of Cong. 1897 (1791). Justice Field made the same point in the course of his defense of state autonomy in his dissenting opinion in *Baltimore & Ohio R. Co.* v. *Baugh,* 149 U. S. 368, 401 (1893), a defense quoted with approval in *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, 78–79 (1938):

> "[T]he Constitution of the United States . . . recognizes and preserves the autonomy and independence of the States—independence in their legislative and independence in their judicial departments. [Federal] [s]upervision over either the legislative or the judicial action of the States is in no case permissible except as to matters by the Constitution specifically authorized or delegated to the United States. Any interference with either, except as thus permitted, is an invasion of

the authority of the State and, to that extent, a denial of its independence."

As a result, to say that the Constitution assumes the continued role of the States is to say little about the nature of that role. Only recently, this Court recognized that the purpose of the constitutional immunity recognized in *National League of Cities* is not to preserve "a sacred province of state autonomy." *EEOC* v. *Wyoming*, 460 U. S., at 236. With rare exceptions, like the guarantee, in Article IV, § 3, of state territorial integrity, the Constitution does not carve out express elements of state sovereignty that Congress may not employ its delegated powers to displace. James Wilson reminded the Pennsylvania ratifying convention in 1787: "It is true, indeed, sir, although it presupposes the existence of state governments, yet this Constitution does not suppose them to be the sole power to be respected." 2 Debates in the Several State Conventions on the Adoption of the Federal Constitution 439 (J. Elliot 2d ed. 1876) (Elliot). The power of the Federal Government is a "power to be respected" as well, and the fact that the States remain sovereign as to all powers not vested in Congress or denied them by the Constitution offers no guidance about where the frontier between state and federal power lies. In short, we have no license to employ freestanding conceptions of state sovereignty when measuring congressional authority under the Commerce Clause.

When we look for the States' "residuary and inviolable sovereignty," The Federalist No. 39, p. 285 (B. Wright ed. 1961) (J. Madison), in the shape of the constitutional scheme rather than in predetermined notions of sovereign power, a different measure of state sovereignty emerges. Apart from the limitation on federal authority inherent in the delegated nature of Congress' Article I powers, the principal means chosen by the Framers to ensure the role of the States in the federal system lies in the structure of the Federal Government itself. It is no novelty to observe that the composition of the Fed-

eral Government was designed in large part to protect the States from overreaching by Congress.[11]   The Framers thus gave the States a role in the selection both of the Executive and the Legislative Branches of the Federal Government. The States were vested with indirect influence over the House of Representatives and the Presidency by their control of electoral qualifications and their role in Presidential elections.   U. S. Const., Art. I, §2, and Art. II, §1.   They were given more direct influence in the Senate, where each State received equal representation and each Senator was to be selected by the legislature of his State.   Art. I, §3.   The significance attached to the States' equal representation in the Senate is underscored by the prohibition of any constitutional amendment divesting a State of equal representation without the State's consent.   Art. V.

The extent to which the structure of the Federal Government itself was relied on to insulate the interests of the States is evident in the views of the Framers.   James Madison explained that the Federal Government "will partake sufficiently of the spirit [of the States], to be disinclined to invade the rights of the individual States, or the prerogatives of their governments."   The Federalist No. 46, p. 332 (B. Wright ed. 1961).   Similarly, James Wilson observed that "it was a favorite object in the Convention" to provide for the security of the States against federal encroachment and that the structure of the Federal Government itself served that end.   2 Elliot, at 438–439.   Madison placed particular reliance on the equal representation of the States in the Senate, which he saw as "at once a constitutional recognition of the portion of sovereignty remaining in the individual

---

[11] See, *e. g.*, J. Choper, Judicial Review and the National Political Process 175–184 (1980); Wechsler, The Political Safeguards of Federalism: The Role of the States in the Composition and Selection of the National Government, 54 Colum. L. Rev. 543 (1954); La Pierre, The Political Safeguards of Federalism Redux: Intergovernmental Immunity and the States as Agents of the Nation, 60 Wash. U. L. Q. 779 (1982).

States, and an instrument for preserving that residuary sovereignty." The Federalist No. 62, p. 408 (B. Wright ed. 1961). He further noted that "the residuary sovereignty of the States [is] implied *and secured* by that principle of representation in one branch of the [federal] legislature" (emphasis added). The Federalist No. 43, p. 315 (B. Wright ed. 1961). See also *McCulloch* v. *Maryland,* 4 Wheat. 316, 435 (1819). In short, the Framers chose to rely on a federal system in which special restraints on federal power over the States inhered principally in the workings of the National Government itself, rather than in discrete limitations on the objects of federal authority. State sovereign interests, then, are more properly protected by procedural safeguards inherent in the structure of the federal system than by judicially created limitations on federal power.

The effectiveness of the federal political process in preserving the States' interests is apparent even today in the course of federal legislation. On the one hand, the States have been able to direct a substantial proportion of federal revenues into their own treasuries in the form of general and program-specific grants in aid. The federal role in assisting state and local governments is a longstanding one; Congress provided federal land grants to finance state governments from the beginning of the Republic, and direct cash grants were awarded as early as 1887 under the Hatch Act.[12] In the past quarter century alone, federal grants to States and localities have grown from $7 billion to $96 billion.[13] As a result, federal

---

[12] See, *e. g.,* A. Howitt, Managing Federalism: Studies in Intergovernmental Relations 3–18 (1984); Break, Fiscal Federalism in the United States: The First 200 Years, Evolution and Outlook, in Advisory Commission on Intergovernmental Relations, The Future of Federalism in the 1980s, pp. 39–54 (July 1981).

[13] A. Howitt, *supra,* at 8; Bureau of the Census, U. S. Dept. of Commerce, Bureau of the Census, Federal Expenditures by State for Fiscal Year 1983, p. 2 (1984) (Census, Federal Expenditures); Division of Gov-

grants now account for about one-fifth of state and local government expenditures.[14]   The States have obtained federal funding for such services as police and fire protection, education, public health and hospitals, parks and recreation, and sanitation.[15]   Moreover, at the same time that the States have exercised their influence to obtain federal support, they have been able to exempt themselves from a wide variety of obligations imposed by Congress under the Commerce Clause.   For example, the Federal Power Act, the National Labor Relations Act, the Labor-Management Reporting and Disclosure Act, the Occupational Safety and Health Act, the Employee Retirement Income Security Act, and the Sherman Act all contain express or implied exemptions for States and their subdivisions.[16]   The fact that some federal statutes such as the FLSA extend general obligations to the States cannot obscure the extent to which the political position of

ernment Accounts and Reports, Fiscal Service—Bureau of Government Financial Operations, Dept. of the Treasury, Federal Aid to States: Fiscal Year 1982, p. 1 (1983 rev. ed.).

[14] Advisory Commission on Intergovernmental Relations, Significant Features of Fiscal Federalism 120, 122 (1984).

[15] See, *e. g.*, the Federal Fire Prevention and Control Act of 1974, 88 Stat. 1535, as amended, 15 U. S. C. § 2201 *et seq.;* the Urban Park and Recreation Recovery Act of 1978, 92 Stat. 3538, 16 U. S. C. § 2501 *et seq.;* the Elementary and Secondary Education Act of 1965, 79 Stat. 27, as amended, 20 U. S. C. § 2701 *et seq.;* the Water Pollution Control Act, 62 Stat. 1155, as amended, 33 U. S. C. § 1251 *et seq.;* the Public Health Service Act, 58 Stat. 682, as amended, 42 U. S. C. § 201 *et seq.;* the Safe Drinking Water Act, 88 Stat. 1660, as amended, 42 U. S. C. § 300f *et seq.;* the Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 197, as amended, 42 U. S. C. § 3701 *et seq.;* the Housing and Community Development Act of 1974, 88 Stat. 633, as amended, 42 U. S. C. § 5301 *et seq.;* and the Juvenile Justice and Delinquency Prevention Act of 1974, 88 Stat. 1109, as amended, 42 U. S. C. § 5601 *et seq.*   See also Census, Federal Expenditures 2–15.

[16] See 16 U. S. C. § 824(f); 29 U. S. C. § 152(2); 29 U. S. C. § 402(e); 29 U. S. C. § 652(5); 29 U. S. C. §§ 1003(b)(1), 1002(32); and *Parker* v. *Brown,* 317 U. S. 341 (1943).

the States in the federal system has served to minimize the burdens that the States bear under the Commerce Clause.[17]

We realize that changes in the structure of the Federal Government have taken place since 1789, not the least of which has been the substitution of popular election of Senators by the adoption of the Seventeenth Amendment in 1913, and that these changes may work to alter the influence of the States in the federal political process.[18]    Nonetheless, against this background, we are convinced that the fundamental limitation that the constitutional scheme imposes on the Commerce Clause to protect the "States as States" is one of process rather than one of result.    Any substantive restraint on the exercise of Commerce Clause powers must find its justification in the procedural nature of this basic limitation, and it must be tailored to compensate for possible failings in the national political process rather than to dictate a "sacred province of state autonomy." *EEOC* v. *Wyoming*, 460 U. S., at 236.

Insofar as the present cases are concerned, then, we need go no further than to state that we perceive nothing in the overtime and minimum-wage requirements of the FLSA, as applied to SAMTA, that is destructive of state sovereignty or violative of any constitutional provision.    SAMTA faces nothing more than the same minimum-wage and overtime obligations that hundreds of thousands of other employers, public as well as private, have to meet.

---

[17] Even as regards the FLSA, Congress incorporated special provisions concerning overtime pay for law enforcement and firefighting personnel when it amended the FLSA in 1974 in order to take account of the special concerns of States and localities with respect to these positions.    See 29 U. S. C. § 207(k).    Congress also declined to impose any obligations on state and local governments with respect to policymaking personnel who are not subject to civil service laws.    See 29 U. S. C. §§ 203(e)(2)(C)(i) and (ii).

[18] See, *e. g.*, Choper, *supra*, at 177–178; Kaden, Politics, Money, and State Sovereignty: The Judicial Role, 79 Colum. L. Rev. 847, 860–868 (1979).

In these cases, the status of public mass transit simply underscores the extent to which the structural protections of the Constitution insulate the States from federally imposed burdens. When Congress first subjected state mass-transit systems to FLSA obligations in 1966, and when it expanded those obligations in 1974, it simultaneously provided extensive funding for state and local mass transit through UMTA. In the two decades since its enactment, UMTA has provided over $22 billion in mass-transit aid to States and localities.[19] In 1983 alone, UMTA funding amounted to $3.7 billion.[20] As noted above, SAMTA and its immediate predecessor have received a substantial amount of UMTA funding, including over $12 million during SAMTA's first two fiscal years alone. In short, Congress has not simply placed a financial burden on the shoulders of States and localities that operate mass-transit systems, but has provided substantial countervailing financial assistance as well, assistance that may leave individual mass-transit systems better off than they would have been had Congress never intervened at all in the area. Congress' treatment of public mass transit reinforces our conviction that the national political process systematically protects States from the risk of having their functions in that area handicapped by Commerce Clause regulation.[21]

## IV

This analysis makes clear that Congress' action in affording SAMTA employees the protections of the wage and hour

---

[19] See Department of Transportation and Related Agencies Appropriations for 1983: Hearings before a Subcommittee of the House Committee on Appropriations, 97th Cong., 2d Sess., pt. 4, p. 808 (1982) (fiscal years 1965–1982); Census, Federal Expenditures 15 (fiscal year 1983).

[20] Ibid.

[21] Our references to UMTA are not meant to imply that regulation under the Commerce Clause must be accompanied by countervailing financial benefits under the Spending Clause. The application of the FLSA to SAMTA would be constitutional even had Congress not provided federal funding under UMTA.

provisions of the FLSA contravened no affirmative limit on Congress' power under the Commerce Clause. The judgment of the District Court therefore must be reversed.

Of course, we continue to recognize that the States occupy a special and specific position in our constitutional system and that the scope of Congress' authority under the Commerce Clause must reflect that position. But the principal and basic limit on the federal commerce power is that inherent in all congressional action—the built-in restraints that our system provides through state participation in federal governmental action. The political process ensures that laws that unduly burden the States will not be promulgated. In the factual setting of these cases the internal safeguards of the political process have performed as intended.

These cases do not require us to identify or define what affirmative limits the constitutional structure might impose on federal action affecting the States under the Commerce Clause. See *Coyle* v. *Oklahoma*, 221 U. S. 559 (1911). We note and accept Justice Frankfurter's observation in *New York* v. *United States*, 326 U. S. 572, 583 (1946):

> "The process of Constitutional adjudication does not thrive on conjuring up horrible possibilities that never happen in the real world and devising doctrines sufficiently comprehensive in detail to cover the remotest contingency. Nor need we go beyond what is required for a reasoned disposition of the kind of controversy now before the Court."

Though the separate concurrence providing the fifth vote in *National League of Cities* was "not untroubled by certain possible implications" of the decision, 426 U. S., at 856, the Court in that case attempted to articulate affirmative limits on the Commerce Clause power in terms of core governmental functions and fundamental attributes of state sovereignty. But the model of democratic decisionmaking the

Court there identified underestimated, in our view, the solicitude of the national political process for the continued vitality of the States. Attempts by other courts since then to draw guidance from this model have proved it both impracticable and doctrinally barren. In sum, in *National League of Cities* the Court tried to repair what did not need repair.

We do not lightly overrule recent precedent.[22] We have not hesitated, however, when it has become apparent that a prior decision has departed from a proper understanding of congressional power under the Commerce Clause. See *United States* v. *Darby*, 312 U. S. 100, 116–117 (1941). Due respect for the reach of congressional power within the federal system mandates that we do so now.

*National League of Cities* v. *Usery*, 426 U. S. 833 (1976), is overruled. The judgment of the District Court is reversed, and these cases are remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE POWELL, with whom THE CHIEF JUSTICE, JUSTICE REHNQUIST, and JUSTICE O'CONNOR join, dissenting.

The Court today, in its 5–4 decision, overrules *National League of Cities* v. *Usery*, 426 U. S. 833 (1976), a case in which we held that Congress lacked authority to impose the requirements of the Fair Labor Standards Act on state and local governments. Because I believe this decision substantially alters the federal system embodied in the Constitution, I dissent.

I

There are, of course, numerous examples over the history of this Court in which prior decisions have been reconsidered and overruled. There have been few cases, however, in which the principle of *stare decisis* and the rationale of recent

---

[22] But see *United States* v. *Scott*, 437 U. S. 82, 86–87 (1978).

decisions were ignored as abruptly as we now witness.[1]   The reasoning of the Court in *National League of Cities*, and the principle applied there, have been reiterated consistently over the past eight years.   Since its decision in 1976, *National League of Cities* has been cited and quoted in opinions joined by every Member of the present Court.   *Hodel* v. *Virginia Surface Mining & Recl. Assn.*, 452 U. S. 264, 287–293 (1981); *Transportation Union* v. *Long Island R. Co.*, 455 U. S. 678, 684–686 (1982); *FERC* v. *Mississippi*, 456 U. S. 742, 764–767 (1982).   Less than three years ago, in *Long Island R. Co.*, *supra*, a unanimous Court reaffirmed the principles of *National League of Cities* but found them inapplicable to the regulation of a railroad heavily engaged in interstate commerce.   The Court stated:

> "The key prong of the *National League of Cities* test applicable to this case is the third one [repeated and reformulated in *Hodel*], which examines whether 'the States' compliance with the federal law would directly impair their ability "to structure integral operations in areas of traditional governmental functions." ' "   455 U. S., at 684.

The Court in that case recognized that the test "may at times be a difficult one," *ibid.*, but it was considered in that unanimous decision as settled constitutional doctrine.

As recently as June 1, 1982, the five Justices who constitute the majority in these cases also were the majority in *FERC* v. *Mississippi*.   In that case, the Court said:

> "In *National League of Cities* v. *Usery*, *supra*, for example, the Court made clear that the State's regulation of its relationship with its employees is an 'undoubted attribute of state sovereignty.'   426 U. S., at 845.   Yet,

---

[1] *National League of Cities*, following some changes in the composition of the Court, had overruled *Maryland* v. *Wirtz*, 392 U. S. 183 (1968).   Unlike *National League of Cities*, the rationale of *Wirtz* had not been repeatedly accepted by our subsequent decisions.

by holding 'unimpaired' *California* v. *Taylor*, 353 U. S. 553 (1957), which upheld a federal labor regulation as applied to state railroad employees, 426 U. S., at 854, n. 18, *National League of Cities* acknowledged that not all aspects of a State's sovereign authority are immune from federal control." 456 U. S., at 764, n. 28.

The Court went on to say that even where the requirements of the *National League of Cities* standard are met, "'[t]here are situations in which the nature of the federal interest advanced may be such that it justifies state submission.'" *Ibid.*, quoting *Hodel, supra*, at 288, n. 29. The joint federal/state system of regulation in *FERC* was such a "situation," but there was no hint in the Court's opinion that *National League of Cities*—or its basic standard—was subject to the infirmities discovered today.

Although the doctrine is not rigidly applied to constitutional questions, "any departure from the doctrine of *stare decisis* demands special justification." *Arizona* v. *Rumsey*, 467 U. S. 203, 212 (1984). See also *Oregon* v. *Kennedy*, 456 U. S. 667, 691–692, n. 34 (1982) (STEVENS, J., concurring in judgment). In the present cases, the five Justices who compose the majority today participated in *National League of Cities* and the cases reaffirming it.[2] The stability of judicial decision, and with it respect for the authority of this Court, are not served by the precipitate overruling of multiple precedents that we witness in these cases.[3]

Whatever effect the Court's decision may have in weakening the application of *stare decisis*, it is likely to be less

---

[2] JUSTICE O'CONNOR, the only new Member of the Court since our decision in *National League of Cities*, has joined the Court in reaffirming its principles. See *Transportation Union* v. *Long Island R. Co.*, 455 U. S. 678 (1982), and *FERC* v. *Mississippi*, 456 U. S. 742, 775 (1982) (O'CONNOR, J., dissenting in part).

[3] As one commentator noted, *stare decisis* represents "a natural evolution from the very nature of our institutions." Lile, Some Views on the Rule of *Stare Decisis*, 4 Va. L. Rev. 95, 97 (1916).

important than what the Court has done to the Constitution itself. A unique feature of the United States is the *federal* system of government guaranteed by the Constitution and implicit in the very name of our country. Despite some genuflecting in the Court's opinion to the concept of federalism, today's decision effectively reduces the Tenth Amendment to meaningless rhetoric when Congress acts pursuant to the Commerce Clause. The Court holds that the Fair Labor Standards Act (FLSA) "contravened no affirmative limit on Congress' power under the Commerce Clause" to determine the wage rates and hours of employment of all state and local employees. *Ante*, at 556. In rejecting the traditional view of our federal system, the Court states:

> "Apart from the limitation on federal authority inherent in the delegated nature of Congress' Article I powers, the principal means chosen by the Framers to ensure the role of the States in the federal system lies in the *structure* of the Federal Government itself." *Ante*, at 550 (emphasis added).

To leave no doubt about its intention, the Court renounces its decision in *National League of Cities* because it "inevitably invites an unelected federal judiciary to make decisions about which state policies its favors and which ones it dislikes." *Ante*, at 546. In other words, the extent to which the States may exercise their authority, when Congress purports to act under the Commerce Clause, henceforth is to be determined from time to time by political decisions made by members of the Federal Government, decisions the Court says will not be subject to judicial review. I note that it does not seem to have occurred to the Court that *it*—an unelected majority of five Justices—today rejects almost 200 years of the understanding of the constitutional status of federalism. In doing so, there is only a single passing reference to the Tenth Amendment. Nor is so much as a dictum of any court cited in support of the view that the role of the States in the federal system may depend upon

the grace of elected federal officials, rather than on the Constitution as interpreted by this Court.

In my opinion that follows, Part II addresses the Court's criticisms of *National League of Cities*. Part III reviews briefly the understanding of federalism that ensured the ratification of the Constitution and the extent to which this Court, until today, has recognized that the States retain a significant measure of sovereignty in our federal system. Part IV considers the applicability of the FLSA to the indisputably local service provided by an urban transit system.

## II

The Court finds that the test of state immunity approved in *National League of Cities* and its progeny is unworkable and unsound in principle. In finding the test to be unworkable, the Court begins by mischaracterizing *National League of Cities* and subsequent cases. In concluding that efforts to define state immunity are unsound in principle, the Court radically departs from long-settled constitutional values and ignores the role of judicial review in our system of government.

### A

Much of the Court's opinion is devoted to arguing that it is difficult to define *a priori* "traditional governmental functions." *National League of Cities* neither engaged in, nor required, such a task.[4] The Court discusses and condemns

---

[4] In *National League of Cities*, we referred to the sphere of state sovereignty as including "traditional governmental functions," a realm which is, of course, difficult to define with precision. But the luxury of precise definitions is one rarely enjoyed in interpreting and applying the general provisions of our Constitution. Not surprisingly, therefore, the Court's attempt to demonstrate the impossibility of definition is unhelpful. A number of the cases it cites simply do not involve the problem of defining governmental functions. *E. g., Williams* v. *Eastside Mental Health Center, Inc.*, 669 F. 2d 671 (CA11), cert. denied, 459 U. S. 976 (1982); *Friends of the Earth* v. *Carey*, 552 F. 2d 25 (CA2), cert. denied, 434 U. S. 902 (1977). A number of others are not properly analyzed under the principles

as standards "traditional governmental functions," "purely historical" functions, "'uniquely' governmental functions," and "'necessary' governmental services." *Ante*, at 539, 543, 545. But nowhere does it mention that *National League of Cities* adopted a familiar type of balancing test for determining whether Commerce Clause enactments transgress constitutional limitations imposed by the federal nature of our system of government. This omission is noteworthy, since the author of today's opinion joined *National League of Cities* and concurred separately to point out that the Court's opinion in that case "adopt[s] a balancing approach [that] does not outlaw federal power in areas . . . where the federal interest is demonstrably greater and where state . . . compliance with imposed federal standards would be essential." 426 U. S., at 856 (BLACKMUN, J., concurring).

In reading *National League of Cities* to embrace a balancing approach, JUSTICE BLACKMUN quite correctly cited the part of the opinion that reaffirmed *Fry* v. *United States*, 421 U. S. 542 (1975). The Court's analysis reaffirming *Fry* explicitly weighed the seriousness of the problem addressed by the federal legislation at issue in that case, against the effects of compliance on state sovereignty. 426 U. S., at 852–853. Our subsequent decisions also adopted this approach of weighing the respective interests of the States and Federal

---

of *National League of Cities*, notwithstanding some of the language of the lower courts. *E. g.*, *United States* v. *Best*, 573 F. 2d 1095 (CA9 1978), and *Hybud Equipment Corp.* v. *City of Akron*, 654 F. 2d 1187 (CA6 1981). Moreover, rather than carefully analyzing the case law, the Court simply lists various functions thought to be protected or unprotected by courts interpreting *National League of Cities*. *Ante*, at 538–539. In the cited cases, however, the courts considered the issue of state immunity on the specific facts at issue; they did not make blanket pronouncements that particular things inherently qualified as traditional governmental functions or did not. Having thus considered the cases out of context, it was not difficult for the Court to conclude that there is no "organizing principle" among them. See *ante*, at 539.

Government.[5]  In *EEOC* v. *Wyoming*, 460 U. S. 226 (1983), for example, the Court stated that "[t]he principle of immunity articulated in *National League of Cities* is a functional doctrine . . . whose ultimate purpose is not to create a sacred province of state autonomy, but to ensure that the unique benefits of a federal system . . . not be lost through undue federal interference in certain core state functions." *Id.*, at 236.  See also *Hodel* v. *Virginia Surface Mining & Recl. Assn.*, 452 U. S. 264 (1981).  In overruling *National League of Cities*, the Court incorrectly characterizes the mode of analysis established therein and developed in subsequent cases.[6]

---

[5] In undertaking such balancing, we have considered, on the one hand, the strength of the federal interest in the challenged legislation and the impact of exempting the States from its reach.  Central to our inquiry into the federal interest is how closely the challenged action implicates the central concerns of the Commerce Clause, viz., the promotion of a national economy and free trade among the States.  See *EEOC* v. *Wyoming*, 460 U. S. 226, 244 (1983) (STEVENS, J., concurring).  See also, for example, *Transportation Union* v. *Long Island R. Co.*, 455 U. S. 678, 688 (1982) ("Congress long ago concluded that federal regulation of railroad labor services is necessary to prevent disruptions in vital rail service essential to the national economy"); *FERC* v. *Mississippi*, 456 U. S. 742, 757 (1982) ("[I]t is difficult to conceive of a more basic element of interstate commerce than electric energy . . . ").  Similarly, we have considered whether exempting States from federal regulation would undermine the goals of the federal program.  See *Fry* v. *United States*, 421 U. S. 542 (1975).  See also *Hodel* v. *Virginia Surface Mining & Recl. Assn.*, 452 U. S. 264, 282 (1981) (national surface mining standards necessary to insure competition among States does not undermine States' efforts to maintain adequate intrastate standards).  On the other hand, we have also assessed the injury done to the States if forced to comply with federal Commerce Clause enactments.  See *National League of Cities*, 426 U. S., at 846–851.

[6] In addition, reliance on the Court's difficulties in the tax immunity field is misplaced.  Although the Court has abandoned the "governmental/proprietary" distinction in this field, see *New York* v. *United States*, 326 U. S. 572 (1946), it has not taken the drastic approach of relying solely on the structure of the Federal Government to protect the States'

Moreover, the statute at issue in this case, the FLSA, is the identical statute that was at issue in *National League of Cities*. Although JUSTICE BLACKMUN's concurrence noted that he was "not untroubled by certain possible implications of the Court's opinion" in *National League of Cities*, it also stated that "the result with respect to the statute under challenge here [the FLSA] is *necessarily correct*." 426 U. S., at 856 (emphasis added). His opinion for the Court today does not discuss the statute, nor identify any changed circumstances that warrant the conclusion today that *National League of Cities* is *necessarily wrong*.

## B

Today's opinion does not explain how the States' role in the electoral process guarantees that particular exercises of the Commerce Clause power will not infringe on residual state sovereignty.[7] Members of Congress are elected from the various States, but once in office they are Members of the

---

immunity from taxation. See *Massachusetts* v. *United States*, 435 U. S. 444 (1978). Thus, faced with an equally difficult problem of defining constitutional boundaries of federal action directly affecting the States, we did not adopt the view many would think naive, that the Federal Government *itself* will protect whatever rights the States may have.

[7] Late in its opinion, the Court suggests that after all there may be some "affirmative limits the constitutional structure might impose on federal action affecting the States under the Commerce Clause." *Ante*, at 556. The Court asserts that "[i]n the factual setting of these cases the internal safeguards of the political process have performed as intended." *Ibid.* The Court does not explain the basis for this judgment. Nor does it identify the circumstances in which the "political process" may fail and "affirmative limits" are to be imposed. Presumably, such limits are to be determined by the Judicial Branch even though it is "unelected." Today's opinion, however, has rejected the balancing standard and suggests no other standard that would enable a court to determine when there has been a malfunction of the "political process." The Court's failure to specify the "affirmative limits" on federal power, or when and how these limits are to be determined, may well be explained by the transparent fact that any such attempt would be subject to precisely the same objections on which it relies to overrule *National League of Cities*.

Federal Government.[8]   Although the States participate in
the Electoral College, this is hardly a reason to view the
President as a representative of the States' interest against
federal encroachment.   We noted recently "[t]he hydraulic
pressure inherent within each of the separate Branches to ex-
ceed the outer limits of its power . . . ."   *INS* v. *Chadha*, 462
U. S. 919, 951 (1983).   The Court offers no reason to think
that this pressure will not operate when Congress seeks to
invoke its powers under the Commerce Clause, notwith-
standing the electoral role of the States.[9]

---

[8] One can hardly imagine this Court saying that because Congress is
composed of individuals, individual rights guaranteed by the Bill of Rights
are amply protected by the political process.   Yet, the position adopted
today is indistinguishable in principle.   The Tenth Amendment also is an
essential part of the Bill of Rights.   See *infra*, at 568–570.

[9] At one time in our history, the view that the structure of the Federal
Government sufficed to protect the States might have had a somewhat
more practical, although not a more logical, basis.   Professor Wechsler,
whose seminal article in 1954 proposed the view adopted by the Court
today, predicated his argument on assumptions that simply do not accord
with current reality.   Professor Wechsler wrote: "National action has . . .
always been regarded as exceptional in our polity, an intrusion to be
justified by some necessity, the special rather than the ordinary case."
Wechsler, The Political Safeguards of Federalism: The Role of the States
in the Composition and Selection of the National Government, 54 Colum.
L. Rev. 543, 544 (1954).   Not only is the premise of this view clearly at
odds with the proliferation of national legislation over the past 30 years,
but "a variety of structural and political changes occurring in this century
have combined to make Congress particularly *insensitive* to state and local
values."   Advisory Commission on Intergovernmental Relations (ACIR),
Regulatory Federalism: Policy, Process, Impact and Reform 50 (1984).
The adoption of the Seventeenth Amendment (providing for direct election
of Senators), the weakening of political parties on the local level, and the
rise of national media, among other things, have made Congress increas-
ingly less representative of state and local interests, and more likely to be
responsive to the demands of various national constituencies.   *Id.*, at
50–51.   As one observer explained: "As Senators and members of the
House develop independent constituencies among groups such as farmers,
businessmen, laborers, environmentalists, and the poor, each of which
generally supports certain national initiatives, their tendency to identify
with state interests and the positions of state officials is reduced."   Kaden,

The Court apparently thinks that the States' success at obtaining federal funds for various projects and exemptions from the obligations of some federal statutes is indicative of the "effectiveness of the federal political process in preserving the States' interests. . . ." *Ante,* at 552.[10] But such political success is not relevant to the question whether the political *processes* are the proper means of enforcing constitutional limitations.[11] The fact that Congress generally

---

Federalism in the Courts: Agenda for the 1980s, in ACIR, The Future of Federalism in the 1980s, p. 97 (July 1981).

See also Kaden, Politics, Money, and State Sovereignty: The Judicial Role, 79 Colum. L. Rev. 847, 849 (1979) (changes in political practices and the breadth of national initiatives mean that the political branches "may no longer be as well suited as they once were to the task of safeguarding the role of the states in the federal system and protecting the fundamental values of federalism"), and ACIR, Regulatory Federalism, *supra,* at 1–24 (detailing the "dramatic shift" in kind of federal regulation applicable to the States over the past two decades). Thus, even if one were to ignore the numerous problems with the Court's position in terms of constitutional theory, there would remain serious questions as to its factual premises.

[10] The Court believes that the significant financial assistance afforded the States and localities by the Federal Government is relevant to the constitutionality of extending Commerce Clause enactments to the States. See *ante,* at 552–553, 555. This Court has never held, however, that the mere disbursement of funds by the Federal Government establishes a right to control activities that benefit from such funds. See *Pennhurst State School and Hospital* v. *Halderman,* 451 U. S. 1, 17–18 (1981). Regardless of the willingness of the Federal Government to provide federal aid, the constitutional question remains the same: whether the federal statute violates the sovereign powers reserved to the States by the Tenth Amendment.

[11] Apparently in an effort to reassure the States, the Court identifies several major statutes that thus far have not been made applicable to state governments: the Federal Power Act, 16 U. S. C. § 824(f); the Labor Management Relations Act, 29 U. S. C. § 152(2); the Labor-Management Reporting and Disclosure Act, 29 U. S. C. § 402(e); the Occupational Safety and Health Act, 29 U. S. C. § 652(5); the Employee Retirement Income Security Act, 29 U. S. C. §§ 1002(32), 1003(b)(1); and the Sherman Act, 15 U. S. C. § 1 *et seq.;* see *Parker* v. *Brown,* 317 U. S. 341 (1943). *Ante,* at 553. The Court does not suggest that this restraint will continue after its decision here. Indeed, it is unlikely that special interest groups will fail

does not transgress constitutional limits on its power to reach state activities does not make judicial review any less necessary to rectify the cases in which it does do so.[12] The States' role in our system of government is a matter of constitutional law, not of legislative grace. "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States, respectively, or to the people." U. S. Const., Amdt. 10.

More troubling than the logical infirmities in the Court's reasoning is the result of its holding, *i. e.*, that federal political officials, invoking the Commerce Clause, are the sole judges of the limits of their own power. This result is inconsistent with the fundamental principles of our constitutional system. See, *e. g.*, The Federalist No. 78 (Hamilton). At least since *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803), it has been the settled province of the federal judiciary "to say what the law is" with respect to the constitutionality of Acts of Congress. In rejecting the role of the judiciary in protecting the States from federal overreaching, the Court's opinion offers no explanation for ignoring the teaching of the most famous case in our history.[13]

---

to accept the Court's open invitation to urge Congress to extend these and other statutes to apply to the States and their local subdivisions.

[12] This Court has never before abdicated responsibility for assessing the constitutionality of challenged action on the ground that affected parties theoretically are able to look out for their own interests through the electoral process. As the Court noted in *National League of Cities*, a much stronger argument as to inherent structural protections could have been made in either *Buckley* v. *Valeo*, 424 U. S. 1 (1976), or *Myers* v. *United States*, 272 U. S. 52 (1926), than can be made here. In these cases, the President signed legislation that limited his authority with respect to certain appointments and thus arguably "it was . . . no concern of this Court that the law violated the Constitution." 426 U. S., at 841–842, n. 12. The Court nevertheless held the laws unconstitutional because they infringed on Presidential authority, the President's consent notwithstanding. The Court does not address this point; nor does it cite any authority for its contrary view.

[13] The Court states that the decision in *National League of Cities* "invites an unelected federal judiciary to make decisions about which state

## III

### A

In our federal system, the States have a major role that cannot be pre-empted by the National Government. As contemporaneous writings and the debates at the ratifying conventions make clear, the States' ratification of the Constitution was predicated on this understanding of federalism. Indeed, the Tenth Amendment was adopted specifically to ensure that the important role promised the States by the proponents of the Constitution was realized.

Much of the initial opposition to the Constitution was rooted in the fear that the National Government would be too powerful and eventually would eliminate the States as viable political entities. This concern was voiced repeatedly until proponents of the Constitution made assurances that a Bill of Rights, including a provision explicitly reserving powers in the States, would be among the first business of the new Congress. Samuel Adams argued, for example, that if the several States were to be joined in "one entire Nation, under one Legislature, the Powers of which shall extend to every Subject of Legislation, and its Laws be supreme & controul the whole, the Idea of Sovereignty in these States must be lost." Letter from Samuel Adams to Richard Henry Lee (Dec. 3, 1787), reprinted in Anti-Federalists versus Federal-

---

policies it favors and which ones its dislikes." Curiously, the Court then suggests that under the application of the "traditional" governmental function analysis, "the States cannot serve as laboratories for social and economic experiment." *Ante*, at 546, citing Justice Brandeis' famous observation in *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 311 (1932) (Brandeis, J., dissenting). Apparently the Court believes that when "an unelected federal judiciary" makes decisions as to whether a particular function is one for the Federal or State Governments, the States no longer may engage in "social and economic experiment." *Ante*, at 546. The Court does not explain how leaving the States virtually at the mercy of the Federal Government, without recourse to judicial review, will enhance their opportunities to experiment and serve as "laboratories."

ists 159 (J. Lewis ed. 1967). Likewise, George Mason feared that "the general government being paramount to, and in every respect more powerful than the state governments, the latter must give way to the former." Address in the Ratifying Convention of Virginia (June 4–12, 1788), reprinted in Anti-Federalists versus Federalists, *supra*, at 208–209.

Antifederalists raised these concerns in almost every state ratifying convention.[14] See generally 1–4 Debates in the Several State Conventions on the Adoption of the Federal Constitution (J. Elliot 2d. ed. 1876). As a result, eight States voted for the Constitution only after proposing amendments to be adopted after ratification.[15] All eight of these included among their recommendations some version of what later became the Tenth Amendment. *Ibid.* So strong was the concern that the proposed Constitution was seriously defective without a specific bill of rights, including a provision reserving powers to the States, that in order to secure the votes for ratification, the Federalists eventually conceded that such provisions were necessary. See 1 B. Schwartz, The Bill of Rights: A Documentary History 505 and *passim* (1971). It was thus generally agreed that consideration of a bill of rights would be among the first business of the new Congress. See generally 1 Annals of Cong. 432–437 (1789) (remarks of James Madison). Accordingly, the 10 Amendments that we know as the Bill of Rights were proposed and adopted early in the first session of the First Congress. 2 Schwartz, The Bill of Rights, *supra*, at 983–1167.

---

[14] Opponents of the Constitution were particularly dubious of the Federalists' claim that the States retained powers not delegated to the United States in the absence of an express provision so providing. For example, James Winthrop wrote that "[i]t is a mere fallacy . . . that what rights are not given are reserved." Letters of Agrippa, reprinted in 1 B. Schwartz, The Bill of Rights: A Documentary History 510, 511 (1971).

[15] Indeed, the Virginia Legislature came very close to withholding ratification of the Constitution until the adoption of a Bill of Rights that included, among other things, the substance of the Tenth Amendment. See 2 Schwartz, The Bill of Rights, *supra*, at 762–766 and *passim*.

This history, which the Court simply ignores, documents the integral role of the Tenth Amendment in our constitutional theory. It exposes as well, I believe, the fundamental character of the Court's error today. Far from being "unsound in principle," *ante,* at 546, judicial enforcement of the Tenth Amendment is essential to maintaining the federal system so carefully designed by the Framers and adopted in the Constitution.

### B

The Framers had definite ideas about the nature of the Constitution's division of authority between the Federal and State Governments. In The Federalist No. 39, for example, Madison explained this division by drawing a series of contrasts between the attributes of a "national" government and those of the government to be established by the Constitution. While a national form of government would possess an "indefinite supremacy over all persons and things," the form of government contemplated by the Constitution instead consisted of "local or municipal authorities [which] form distinct and independent portions of the supremacy, no more subject within their respective spheres to the general authority, than the general authority is subject to them, within its own sphere." *Id.,* at 256 (J. Cooke ed. 1961). Under the Constitution, the sphere of the proposed government extended to jurisdiction of "certain enumerated objects only, . . . leav[ing] to the several States a residuary and inviolable sovereignty over all other objects." *Ibid.*

Madison elaborated on the content of these separate spheres of sovereignty in The Federalist No. 45:

> "The powers delegated by the proposed Constitution to the Federal Government, are few and defined. Those which are to remain in the State Governments are numerous and indefinite. The former will be exercised principally on external objects, as war, peace, negociation, and foreign commerce . . . . The powers

reserved to the several States will extend to all the objects, which, in the ordinary course of affairs, concern the lives, liberties and properties of the people; and the internal order, improvement, and prosperity of the State." *Id.*, at 313 (J. Cooke ed. 1961).

Madison considered that the operations of the Federal Government would be "most extensive and important in times of war and danger; those of the State Governments in times of peace and security." *Ibid.* As a result of this division of powers, the state governments generally would be more important than the Federal Government. *Ibid.*

The Framers believed that the separate sphere of sovereignty reserved to the States would ensure that the States would serve as an effective "counterpoise" to the power of the Federal Government. The States would serve this essential role because they would attract and retain the loyalty of their citizens. The roots of such loyalty, the Founders thought, were found in the objects peculiar to state government. For example, Hamilton argued that the States "regulat[e] all those personal interests and familiar concerns to which the sensibility of individuals is more immediately awake . . . ." The Federalist No. 17, p. 107 (J. Cooke ed. 1961). Thus, he maintained that the people would perceive the States as "the immediate and visible guardian of life and property," a fact which "contributes more than any other circumstance to impressing upon the minds of the people affection, esteem and reverence towards the government." *Ibid.* Madison took the same position, explaining that "the people will be more familiarly and minutely conversant" with the business of state governments, and "with the members of these, will a greater proportion of the people have the ties of personal acquaintance and friendship, and of family and party attachments . . . ." The Federalist No. 46, p. 316 (J. Cooke ed. 1961). Like Hamilton, Madison saw the States' involvement in the everyday concerns of the people as the source of

their citizens' loyalty. *Ibid.* See also Nagel, Federalism as a Fundamental Value: National League of Cities in Perspective, 1981 S. Ct. Rev. 81.

Thus, the harm to the States that results from federal overreaching under the Commerce Clause is not simply a matter of dollars and cents. *National League of Cities,* 426 U. S., at 846–851. Nor is it a matter of the wisdom or folly of certain policy choices. Cf. *ante,* at 546. Rather, by usurping functions traditionally performed by the States, federal overreaching under the Commerce Clause undermines the constitutionally mandated balance of power between the States and the Federal Government, a balance designed to protect our fundamental liberties.

## C

The emasculation of the powers of the States that can result from the Court's decision is predicated on the Commerce Clause as a power "delegated to the United States" by the Constitution. The relevant language states: "Congress shall have power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Art. I, § 8, cl. 3. Section 8 identifies a score of powers, listing the authority to lay taxes, borrow money on the credit of the United States, pay its debts, and provide for the common defense and the general welfare *before* its brief reference to "Commerce." It is clear from the debates leading up to the adoption of the Constitution that the commerce to be regulated was that which the States themselves lacked the practical capability to regulate. See, *e. g.,* 1 M. Farrand, The Records of the Federal Convention of 1787 (rev. ed. 1937); The Federalist Nos. 7, 11, 22, 42, 45. See also *EEOC v. Wyoming,* 460 U. S. 226, 265 (1983) (POWELL, J., dissenting). Indeed, the language of the Clause itself focuses on activities that only a National Government could regulate: commerce with foreign nations and Indian tribes and *"among"* the several States.

To be sure, this Court has construed the Commerce Clause to accommodate unanticipated changes over the past two centuries. As these changes have occurred, the Court has had to decide whether the Federal Government has exceeded its authority by regulating activities beyond the capability of a single State to regulate or beyond legitimate federal interests that outweighed the authority and interests of the States. In so doing, however, the Court properly has been mindful of the essential role of the States in our federal system.

The opinion for the Court in *National League of Cities* was faithful to history in its understanding of federalism. The Court observed that "our federal system of government imposes definite limits upon the authority of Congress to regulate the activities of States as States by means of the commerce power." 426 U. S., at 842. The Tenth Amendment was invoked to prevent Congress from exercising its "'power in a fashion that impairs the States' integrity or their ability to function effectively in a federal system.'" *Id.*, at 842–843 (quoting *Fry* v. *United States*, 421 U. S., at 547, n. 7).

This Court has recognized repeatedly that state sovereignty is a fundamental component of our system of government. More than a century ago, in *Lane County* v. *Oregon*, 7 Wall. 71 (1869), the Court stated that the Constitution recognized "the necessary existence of the States, and, within their proper spheres, the independent authority of the States." It concluded, as Madison did, that this authority extended to "nearly the whole charge of interior regulation . . . ; to [the States] and to the people all powers not expressly delegated to the national government are reserved." *Id.*, at 76. Recently, in *Community Communications Co.* v. *Boulder*, 455 U. S. 40, 53 (1982), the Court recognized that the state action exemption from the antitrust laws was based on state sovereignty. Similarly, in *Transportation Union* v. *Long Island R. Co.*, 455 U. S., at 683, although finding the Railway Labor Act applicable to a state-owned railroad, the

unanimous Court was careful to say that the States possess constitutionally preserved sovereign powers.

Again, in *FERC* v. *Mississippi*, 456 U. S. 742, 752 (1982), in determining the constitutionality of the Public Utility Regulatory Policies Act, the Court explicitly considered whether the Act impinged on state sovereignty in violation of the Tenth Amendment. These represent only a few of the many cases in which the Court has recognized not only the role, but also the importance, of state sovereignty. See also, *e. g.*, *Fry* v. *United States, supra; Metcalf & Eddy* v. *Mitchell*, 269 U. S. 514 (1926); *Coyle* v. *Oklahoma*, 221 U. S. 559 (1911). As Justice Frankfurter noted, the States are not merely a factor in the "shifting economic arrangements" of our country, *Kovacs* v. *Cooper*, 336 U. S. 77, 95 (1949) (concurring), but also constitute a "coordinate element in the system established by the Framers for governing our Federal Union." *National League of Cities, supra*, at 849.

## D

In contrast, the Court today propounds a view of federalism that pays only lipservice to the role of the States. Although it says that the States "unquestionably do 'retai[n] a significant measure of sovereign authority,'" *ante*, at 549 (quoting *EEOC* v. *Wyoming, supra*, at 269 (POWELL, J., dissenting)), it fails to recognize the broad, yet specific areas of sovereignty that the Framers intended the States to retain. Indeed, the Court barely acknowledges that the Tenth Amendment exists.[16] That Amendment states explicitly that "[t]he powers not delegated to the United States . . . are reserved to the States." The Court recasts this language to say that the States retain their sovereign powers "only to the extent that the Constitution has not divested them of their original powers and transferred those powers to the Federal

---

[16] The Court's opinion mentions the Tenth Amendment only once, when it restates the question put to the parties for reargument in these cases. See *ante*, at 536.

Government." *Ante*, at 549. This rephrasing is not a distinction without a difference; rather, it reflects the Court's unprecedented view that Congress is free under the Commerce Clause to assume a State's traditional sovereign power, and to do so without judicial review of its action. Indeed, the Court's view of federalism appears to relegate the States to precisely the trivial role that opponents of the Constitution feared they would occupy.[17]

In *National League of Cities*, we spoke of fire prevention, police protection, sanitation, and public health as "typical of [the services] performed by state and local governments in discharging their dual functions of administering the public law and furnishing public services." 426 U. S., at 851. Not only are these activities remote from any normal concept of interstate commerce, they are also activities that epitomize the concerns of local, democratic self-government. See n. 5, *supra*. In emphasizing the need to protect traditional governmental functions, we identified the kinds of activities engaged in by state and local governments that affect the everyday lives of citizens. These are services that people are in a position to understand and evaluate, and in a democracy, have the right to oversee.[18] We recognized that "it is

---

[17] As the *amici* argue, "the ability of the states to fulfill their role in the constitutional scheme is dependent solely upon their effectiveness as instruments of self-government." Brief for State of California et al. as *Amici Curiae* 50. See also Brief for National League of Cities et al. as *Amici Curiae* (a brief on behalf of every major organization representing the concerns of state and local governments).

[18] The Framers recognized that the most effective democracy occurs at local levels of government, where people with firsthand knowledge of local problems have more ready access to public officials responsible for dealing with them. *E. g.*, The Federalist No. 17, p. 107 (J. Cooke ed. 1961); The Federalist No. 46, p. 316 (J. Cooke ed. 1961). This is as true today as it was when the Constitution was adopted. "Participation is likely to be more frequent, and exercised at more different stages of a governmental activity at the local level, or in regional organizations, than at the state and federal levels. [Additionally,] the proportion of people actually involved from the total population tends to be greater, the lower the level of govern-

functions such as these which governments are created to provide . . ." and that the States and local governments are better able than the National Government to perform them. 426 U. S., at 851.

The Court maintains that the standard approved in *National League of Cities* "disserves principles of democratic self-governance." *Ante*, at 547. In reaching this conclusion, the Court looks myopically only to persons elected to positions in the Federal Government. It disregards entirely the far more effective role of democratic self-government at the state and local levels. One must compare realistically the operation of the state and local governments with that of the Federal Government. Federal legislation is drafted primarily by the staffs of the congressional committees. In view of the hundreds of bills introduced at each session of Congress and the complexity of many of them, it is virtually impossible for even the most conscientious legislators to be truly familiar with many of the statutes enacted. Federal departments and agencies customarily are authorized to write regulations. Often these are more important than the text of the statutes. As is true of the original legislation, these are drafted largely by staff personnel. The administration and enforcement of federal laws and regulations necessarily are largely in the hands of staff and civil service employees. These employees may have little or no knowledge of the States and localities that will be affected by the statutes and regulations for which they are responsible. In any case, they hardly are as accessible and responsive

---

ment, and this, of course, better approximates the citizen participation ideal." ACIR, Citizen Participation in the American Federal System 95 (1980).

Moreover, we have witnessed in recent years the rise of numerous special interest groups that engage in sophisticated lobbying, and make substantial campaign contributions to some Members of Congress. These groups are thought to have significant influence in the shaping and enactment of certain types of legislation. Contrary to the Court's view, a "political process" that functions in this way is unlikely to safeguard the sovereign rights of States and localities. See n. 9, *supra*.

as those who occupy analogous positions in state and local governments.

In drawing this contrast, I imply no criticism of these federal employees or the officials who are ultimately in charge. The great majority are conscientious and faithful to their duties. My point is simply that members of the immense federal bureaucracy are not elected, know less about the services traditionally rendered by States and localities, and are inevitably less responsive to recipients of such services, than are state legislatures, city councils, boards of supervisors, and state and local commissions, boards, and agencies. It is at these state and local levels—not in Washington as the Court so mistakenly thinks—that "democratic self-government" is best exemplified.

## IV

The question presented in these cases is whether the extension of the FLSA to the wages and hours of employees of a city-owned transit system unconstitutionally impinges on fundamental state sovereignty. The Court's sweeping holding does far more than simply answer this question in the negative. In overruling *National League of Cities*, today's opinion apparently authorizes federal control, under the auspices of the Commerce Clause, over the terms and conditions of employment of all state and local employees. Thus, for purposes of federal regulation, the Court rejects the distinction between public and private employers that had been drawn carefully in *National League of Cities*. The Court's action reflects a serious misunderstanding, if not an outright rejection, of the history of our country and the intention of the Framers of the Constitution.[19]

---

[19] The opinion of the Court in *National League of Cities* makes clear that the very essence of a federal system of government is to impose "definite limits upon the authority of Congress to regulate the activities of the States as States by means of the commerce power." 426 U. S., at 842. See also the Court's opinion in *Fry* v. *United States*, 421 U. S. 542, 547, n. 7 (1975).

I return now to the balancing test approved in *National League of Cities* and accepted in *Hodel, Long Island R. Co.*, and *FERC* v. *Mississippi.* See n. 5, *supra.* The Court does not find in these cases that the "federal interest is demonstrably greater." 426 U. S., at 856 (BLACKMUN, J., concurring). No such finding could have been made, for the state interest is compelling. The financial impact on States and localities of displacing their control over wages, hours, overtime regulations, pensions, and labor relations with their employees could have serious, as well as unanticipated, effects on state and local planning, budgeting, and the levying of taxes.[20] As we said in *National League of Cities*, federal control of the terms and conditions of employment of state employees also inevitably "displaces state policies regarding the manner in which [States] will structure delivery of those governmental services that citizens require." *Id.*, at 847.

The Court emphasizes that municipal operation of an intracity mass transit system is relatively new in the life of our country. It nevertheless is a classic example of the type of service traditionally provided by local government. It is *local* by definition. It is indistinguishable in principle from the traditional services of providing and maintaining streets, public lighting, traffic control, water, and sewerage systems.[21] Services of this kind are precisely those with which citizens are more "familiarly and minutely conversant." The Federalist No. 46, p. 316 (J. Cooke ed. 1961). State and local officials of course must be intimately familiar with these services and sensitive to their quality as well as cost. Such

---

[20] As Justice Douglas observed in his dissent in *Maryland* v. *Wirtz*, 392 U. S., at 203, extension of the FLSA to the States could "disrupt the fiscal policy of the States and threaten their autonomy in the regulation of health and education."

[21] In *Long Island R. Co.* the unanimous Court recognized that "[t]his Court's emphasis on traditional governmental functions and traditional aspects of state sovereignty was not meant to impose a static historical view of state functions generally immune from federal regulation." 455 U. S., at 686.

officials also know that their constituents and the press respond to the adequacy, fair distribution, and cost of these services. It is this kind of state and local control and accountability that the Framers understood would insure the vitality and preservation of the federal system that the Constitution explicitly requires. See *National League of Cities*, 426 U. S., at 847–852.

## V

Although the Court's opinion purports to recognize that the States retain some sovereign power, it does not identify even a single aspect of state authority that would remain when the Commerce Clause is invoked to justify federal regulation. In *Maryland* v. *Wirtz*, 392 U. S. 183 (1968), overruled by *National League of Cities* and today reaffirmed, the Court sustained an extension of the FLSA to certain hospitals, institutions, and schools. Although the Court's opinion in *Wirtz* was comparatively narrow, Justice Douglas, in dissent, wrote presciently that the Court's reading of the Commerce Clause would enable "the National Government [to] devour the essentials of state sovereignty, though that sovereignty is attested by the Tenth Amendment." 392 U. S., at 205. Today's decision makes Justice Douglas' fear once again a realistic one.

As I view the Court's decision today as rejecting the basic precepts of our federal system and limiting the constitutional role of judicial review, I dissent.

JUSTICE REHNQUIST, dissenting.

I join both JUSTICE POWELL's and JUSTICE O'CONNOR's thoughtful dissents. JUSTICE POWELL's reference to the "balancing test" approved in *National League of Cities* is not identical with the language in that case, which recognized that Congress could not act under its commerce power to infringe on certain fundamental aspects of state sovereignty that are essential to "the States' separate and independent existence." Nor is either test, or JUSTICE

O'CONNOR's suggested approach, precisely congruent with JUSTICE BLACKMUN's views in 1976, when he spoke of a balancing approach which did not outlaw federal power in areas "where the federal interest is demonstrably greater." But under any one of these approaches the judgment in these cases should be affirmed, and I do not think it incumbent on those of us in dissent to spell out further the fine points of a principle that will, I am confident, in time again command the support of a majority of this Court.

JUSTICE O'CONNOR, with whom JUSTICE POWELL and JUSTICE REHNQUIST join, dissenting.

The Court today surveys the battle scene of federalism and sounds a retreat. Like JUSTICE POWELL, I would prefer to hold the field and, at the very least, render a little aid to the wounded. I join JUSTICE POWELL's opinion. I also write separately to note my fundamental disagreement with the majority's views of federalism and the duty of this Court.

The Court overrules *National League of Cities* v. *Usery*, 426 U. S. 833 (1976), on the grounds that it is not "faithful to the role of federalism in a democratic society." *Ante*, at 546. "The essence of our federal system," the Court concludes, "is that within the realm of authority left open to them under the Constitution, the States must be equally free to engage in any activity that their citizens choose for the common weal. . . ." *Ibid.* *National League of Cities* is held to be inconsistent with this narrow view of federalism because it attempts to protect only those fundamental aspects of state sovereignty that are essential to the States' separate and independent existence, rather than protecting all state activities "equally."

In my view, federalism cannot be reduced to the weak "essence" distilled by the majority today. There is more to federalism than the nature of the constraints that can be imposed on the States in "the realm of authority left open to them by the Constitution." The central issue of federalism,

of course, is whether any realm *is* left open to the States by the Constitution—whether any area remains in which a State may act free of federal interference. "The issue . . . is whether the federal system has any *legal* substance, any core of constitutional right that courts will enforce." C. Black, Perspectives in Constitutional Law 30 (1963). The true "essence" of federalism is that the States *as States* have legitimate interests which the National Government is bound to respect even though its laws are supreme. *Younger* v. *Harris,* 401 U. S. 37, 44 (1971). If federalism so conceived and so carefully cultivated by the Framers of our Constitution is to remain meaningful, this Court cannot abdicate its constitutional responsibility to oversee the Federal Government's compliance with its duty to respect the legitimate interests of the States.

Due to the emergence of an integrated and industrialized national economy, this Court has been required to examine and review a breathtaking expansion of the powers of Congress. In doing so the Court correctly perceived that the Framers of our Constitution intended Congress to have sufficient power to address national problems. But the Framers were not single-minded. The Constitution is animated by an array of intentions. *EEOC* v. *Wyoming,* 460 U. S. 226, 265–266 (1983) (POWELL, J., dissenting). Just as surely as the Framers envisioned a National Government capable of solving national problems, they also envisioned a republic whose vitality was assured by the diffusion of power not only among the branches of the Federal Government, but also between the Federal Government and the States. *FERC* v. *Mississippi,* 456 U. S. 742, 790 (1982) (O'CONNOR, J., dissenting). In the 18th century these intentions did not conflict because technology had not yet converted every local problem into a national one. A conflict has now emerged, and the Court today retreats rather than reconcile the Constitution's dual concerns for federalism and an effective commerce power.

We would do well to recall the constitutional basis for federalism and the development of the commerce power which has come to displace it. The text of the Constitution does not define the precise scope of state authority other than to specify, in the Tenth Amendment, that the powers not delegated to the United States by the Constitution are reserved to the States. In the view of the Framers, however, this did not leave state authority weak or defenseless; the powers delegated to the United States, after all, were "few and defined." The Federalist No. 45, p. 313 (J. Cooke ed. 1961). The Framers' comments indicate that the sphere of state activity was to be a significant one, as JUSTICE POWELL's opinion clearly demonstrates, *ante* at 570–572. The States were to retain authority over those local concerns of greatest relevance and importance to the people. The Federalist No. 17, pp. 106–108 (J. Cooke ed. 1961). This division of authority, according to Madison, would produce efficient government and protect the rights of the people:

> "In a single republic, all the power surrendered by the people, is submitted to the administration of a single government; and usurpations are guarded against by a division of the government into distinct and separate departments. In the compound republic of America, the power surrendered by the people, is first divided between two distinct governments, and then the portion allotted to each, subdivided among distinct and separate departments. Hence a double security arises to the rights of the people. The different governments will controul each other; at the same time that each will be controuled by itself." The Federalist No. 51, pp. 350–351 (J. Cooke ed. 1961).

See Nagel, Federalism as a Fundamental Value: National League of Cities in Perspective, 1981 S. Ct. Rev. 81, 88.

Of course, one of the "few and defined" powers delegated to the National Congress was the power "To regulate Com-

merce with foreign Nations, and among the several States, and with the Indian Tribes." U. S. Const., Art. I, § 8, cl. 3. The Framers perceived the interstate commerce power to be important but limited, and expected that it would be used primarily if not exclusively to remove interstate tariffs and to regulate maritime affairs and large-scale mercantile enterprise. See Abel, The Commerce Clause in the Constitutional Convention and in Contemporary Comment, 25 Minn. L. Rev. 432 (1941). This perception of a narrow commerce power is important not because it suggests that the commerce power should be as narrowly construed today. Rather, it explains why the Framers could believe the Constitution assured significant state authority even as it bestowed a range of powers, including the commerce power, on the Congress. In an era when interstate commerce represented a tiny fraction of economic activity and most goods and services were produced and consumed close to home, the interstate commerce power left a broad range of activities beyond the reach of Congress.

In the decades since ratification of the Constitution, interstate economic activity has steadily expanded. Industrialization, coupled with advances in transportation and communications, has created a national economy in which virtually every activity occurring within the borders of a State plays a part. The expansion and integration of the national economy brought with it a coordinate expansion in the scope of national problems. This Court has been increasingly generous in its interpretation of the commerce power of Congress, primarily to assure that the National Government would be able to deal with national economic problems. Most significantly, the Court in *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1 (1937), and *United States* v. *Darby*, 312 U. S. 100 (1941), rejected its previous interpretations of the commerce power which had stymied New Deal legislation. *Jones & Laughlin* and *Darby* embraced the notion that Congress can regulate intrastate activities that affect

interstate commerce as surely as it can regulate interstate commerce directly. Subsequent decisions indicate that Congress, in order to regulate an activity, needs only a rational basis for a finding that the activity affects interstate commerce. See *Heart of Atlanta Motel, Inc.* v. *United States,* 379 U. S. 241, 258 (1964). Even if a particular individual's activity has no perceptible interstate effect, it can be reached by Congress through regulation of that class of activity in general as long as that *class,* considered as a whole, affects interstate commerce. *Fry* v. *United States,* 421 U. S. 542 (1975); *Perez* v. *United States,* 402 U. S. 146 (1971).

Incidental to this expansion of the commerce power, Congress has been given an ability it lacked prior to the emergence of an integrated national economy. Because virtually every *state* activity, like virtually every activity of a private individual, arguably "affects" interstate commerce, Congress can now supplant the States from the significant sphere of activities envisioned for them by the Framers. It is in this context that recent changes in the workings of Congress, such as the direct election of Senators and the expanded influence of national interest groups, see *ante,* at 544, n. 9 (POWELL, J., dissenting), become relevant. These changes may well have lessened the weight Congress gives to the legitimate interests of States as States. As a result, there is now a real risk that Congress will gradually erase the diffusion of power between State and Nation on which the Framers based their faith in the efficiency and vitality of our Republic.

It would be erroneous, however, to conclude that the Supreme Court was blind to the threat to federalism when it expanded the commerce power. The Court based the expansion on the authority of Congress, through the Necessary and Proper Clause, "to resort to all means for the exercise of a granted power which are appropriate and plainly adapted to the permitted end." *United States* v. *Darby, supra,* at 124. It is through this reasoning that an intrastate activity "affecting" interstate commerce can be reached through the

585

commerce power. Thus, in *United States* v. *Wrightwood Dairy Co.*, 315 U. S. 110, 119 (1942), the Court stated:

> "The commerce power is not confined in its exercise to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce, or the exertion of the power of Congress over it, as to make regulation of them appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce. See *McCulloch* v. *Maryland*, 4 Wheat. 316, 421 . . . ."

*United States* v. *Wrightwood Dairy Co.* was heavily relied upon by *Wickard* v. *Filburn*, 317 U. S. 111, 124 (1942), and the reasoning of these cases underlies every recent decision concerning the reach of Congress to activities affecting interstate commerce. See, *e. g.*, *Fry* v. *United States, supra*, at 547; *Perez* v. *United States, supra*, at 151–152; *Heart of Atlanta Motel, Inc.* v. *United States, supra*, at 258–259.

It is worth recalling the cited passage in *McCulloch* v. *Maryland*, 4 Wheat. 316, 421 (1819), that lies at the source of the recent expansion of the commerce power. "Let the end be legitimate, let it be within the scope of the constitution," Chief Justice Marshall said, "and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter *and spirit* of the constitution, are constitutional" (emphasis added). The *spirit* of the Tenth Amendment, of course, is that the States will retain their integrity in a system in which the laws of the United States are nevertheless supreme. *Fry* v. *United States, supra*, at 547, n. 7.

It is not enough that the "end be legitimate"; the means to that end chosen by Congress must not contravene the spirit of the Constitution. Thus many of this Court's decisions acknowledge that the means by which national power is exercised must take into account concerns for state autonomy. See, *e. g.*, *Fry* v. *United States, supra*, at 547, n. 7; *New*

*York* v. *United States*, 326 U. S. 572, 586–587 (1946) (Stone, C. J., concurring); *NLRB* v. *Jones & Laughlin Steel Corp.*, *supra*, at 37 ("Undoubtedly, the scope of this [commerce] power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government"); *Santa Cruz Fruit Packing Co.* v. *NLRB*, 303 U. S. 453, 466–467 (1938). See also Sandalow, Constitutional Interpretation, 79 Mich. L. Rev. 1033, 1055 (1981) ("The question, always, is whether the exercise of power is consistent with the entire Constitution, a question that can be answered only by taking into account, so far as they are relevant, all of the values to which the Constitution—as interpreted over time—gives expression"). For example, Congress might rationally conclude that the location a State chooses for its capital may affect interstate commerce, but the Court has suggested that Congress would nevertheless be barred from dictating that location because such an exercise of a delegated power would undermine the state sovereignty inherent in the Tenth Amendment. *Coyle* v. *Oklahoma*, 221 U. S. 559, 565 (1911). Similarly, Congress in the exercise of its taxing and spending powers can protect federal savings and loan associations, but if it chooses to do so by the means of converting quasi-public state savings and loan associations into federal associations, the Court has held that it contravenes the reserved powers of the States because the conversion is not a reasonably necessary exercise of power to reach the desired end. *Hopkins Federal Savings & Loan Assn.* v. *Cleary*, 296 U. S. 315 (1935). The operative language of these cases varies, but the underlying principle is consistent: state autonomy is a relevant factor in assessing the means by which Congress exercises its powers.

This principle requires the Court to enforce affirmative limits on federal regulation of the States to complement the judicially crafted expansion of the interstate commerce power. *National League of Cities* v. *Usery* represented an attempt to define such limits. The Court today rejects *National League of Cities* and washes its hands of all efforts to protect the States. In the process, the Court opines that unwarranted federal encroachments on state authority are and will remain "'horrible possibilities that never happen in the real world.'" *Ante,* at 556, quoting *New York* v. *United States, supra,* at 583 (opinion of Frankfurter, J.). There is ample reason to believe to the contrary.

The last two decades have seen an unprecedented growth of federal regulatory activity, as the majority itself acknowledges. *Ante,* at 544–545, n. 10. In 1954, one could still speak of a "burden of persuasion on those favoring national intervention" in asserting that "National action has . . . always been regarded as exceptional in our polity, an intrusion to be justified by some necessity, the special rather than the ordinary case." Wechsler, The Political Safeguards of Federalism: The Role of the States in the Composition and Selection of the National Government, 54 Colum. L. Rev. 543, 544–545 (1954). Today, as federal legislation and coercive grant programs have expanded to embrace innumerable activities that were once viewed as local, the burden of persuasion has surely shifted, and the extraordinary has become ordinary. See Engdahl, Sense and Nonsense About State Immunity, 2 Constitutional Commentary 93 (1985). For example, recently the Federal Government has, with this Court's blessing, undertaken to tell the States the age at which they can retire their law enforcement officers, and the regulatory standards, procedures, and even the agenda which their utilities commissions must consider and follow. See *EEOC* v. *Wyoming,* 460 U. S. 226 (1983); *FERC* v. *Mississippi,* 456 U. S. 742 (1982). The political process

has not protected against these encroachments on state activities, even though they directly impinge on a State's ability to make and enforce its laws. With the abandonment of *National League of Cities*, all that stands between the remaining essentials of state sovereignty and Congress is the latter's underdeveloped capacity for self-restraint.

The problems of federalism in an integrated national economy are capable of more responsible resolution than holding that the States as States retain no status apart from that which Congress chooses to let them retain. The proper resolution, I suggest, lies in weighing state autonomy as a factor in the balance when interpreting the means by which Congress can exercise its authority on the States as States. It is insufficient, in assessing the validity of congressional regulation of a State pursuant to the commerce power, to ask only whether the same regulation would be valid if enforced against a private party. That reasoning, embodied in the majority opinion, is inconsistent with the spirit of our Constitution. It remains relevant that a *State* is being regulated, as *National League of Cities* and every recent case have recognized. See *EEOC* v. *Wyoming, supra; Transportation Union* v. *Long Island R. Co.*, 455 U. S. 678, 684 (1982); *Hodel* v. *Virginia Surface Mining & Recl. Assn.*, 452 U. S. 264, 287–288 (1981); *National League of Cities*, 426 U. S., at 841–846. As far as the Constitution is concerned, a State should not be equated with any private litigant. Cf. *Nevada* v. *Hall*, 440 U. S. 410, 428 (1979) (BLACKMUN, J., dissenting) (criticizing the ability of a state court to treat a sister State no differently than a private litigant). Instead, the autonomy of a State is an essential component of federalism. If state autonomy is ignored in assessing the means by which Congress regulates matters affecting commerce, then federalism becomes irrelevant simply because the set of activities remaining beyond the reach of such a commerce power "may well be negligible." *Ante*, at 545.

It has been difficult for this Court to craft bright lines defining the scope of the state autonomy protected by *National*

*League of Cities.* Such difficulty is to be expected whenever constitutional concerns as important as federalism and the effectiveness of the commerce power come into conflict. Regardless of the difficulty, it is and will remain the duty of this Court to reconcile these concerns in the final instance. That the Court shuns the task today by appealing to the "essence of federalism" can provide scant comfort to those who believe our federal system requires something more than a unitary, centralized government. I would not shirk the duty acknowledged by *National League of Cities* and its progeny, and I share JUSTICE REHNQUIST's belief that this Court will in time again assume its constitutional responsibility.

I respectfully dissent.