ALAMEDA COUNTY TRAINING AND EMPLOYMENT BOARD, Petitioner,

v.

U.S. DEPARTMENT OF LABOR; Roderick A. DeArment, Acting Secretary of Labor, Respondents.

No. 90–70537.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 15, 1991.

Decided April 23, 1991.

Jose D.R. Guerrero, Oakland, Cal., for petitioner.

Vincent C. Costantino, Office of the Sol., U.S. Dept. of Labor, Washington, D.C., for respondents.

Marjorie Gelb, Asst. City Atty., Berkeley, Cal., for amicus.

Before TANG, BOOCHEVER and NOONAN, Circuit Judges.

BOOCHEVER, Circuit Judge:

Alameda County Training and Employment Board petitions for review of then Secretary of Labor Dole's decision affirming then California Governor Deukmejian's disapproval of the Board's job training plan. We deny the petition.

## BACKGROUND

The stated purpose of the Job Training Partnership Act (the Act), 29 U.S.C. § 1501 *et seq.*, is "to establish programs to prepare youth and unskilled adults for entry into the labor force and to afford job training to those economically disadvantaged individuals and other individuals facing serious barriers to employment, who are in special need of such training to obtain productive employment." 29 U.S.C. § 1501 (1988). To effectuate this goal, the federal government appropriates money to local administrative units known as "service delivery areas." Each state's governor is responsible for designating that state's service delivery areas according to criteria spelled out in the Act. *See* 29 U.S.C. § 1511 (1988).

The instant case centers around one of California's service delivery areas, the Alameda County Service Delivery Area, which consisted of fourteen units of local government: Alameda County, and the cities of Alameda, Albany, Berkeley, Dublin, Emeryville, Fremont, Hayward, Livermore, Newark, Piedmont, Pleasanton, San Leandro and Union City. Until Berkeley's

---

recent withdrawal, these units also made up the Alameda County Training and Employment Board. Pursuant to a September 1, 1983 agreement of all fourteen units, the chief elected official of each unit, or its authorized representative, belonged to the Board. Among other enumerated duties, the Board had the authority to develop, approve and submit job training plans to the Governor.

In the early 1980's, the Board denied Berkeley a seat on the Board due to Berkeley City Council's refusal to recite the Pledge of Allegiance before each Council meeting. Berkeley sued the Board, and in 1984, a district court held that the Board could not exclude Berkeley. Upon Berkeley's admission, the Board entered into a "pass-through" agreement pursuant to which Berkeley administered its own job training program. The funds for this program were channeled from the federal government through the Board to Berkeley. Specifically, the "pass-through" agreement provided:

Job training entitlement funds received by [the Board] by virtue of the City of Berkeley's inclusion in the Alameda County Service Delivery Area shall be disbursed in accordance with [side] agreements executed between [the Board] and the City of Berkeley for one or more program years. The terms of such agreements shall, upon execution of the agreements, be deemed incorporated by reference herein. The failure to execute such an agreement at least sixty (60) days prior to the expiration of the term of any existing agreement shall entitle the City of Berkeley, upon thirty (30) days written notice to [the Board], to terminate its participation in the [Board's] joint powers agency.

In early 1990, the Board decided it did not want to renew its "side agreement" with Berkeley but instead wanted Berkeley to participate in the Board's job training program. In response, on March 7, 1990, Berkeley exercised its option and withdrew from the Board. Pursuant to the "pass-through" agreement, the termination of Berkeley's participation took effect thirty days later on April 6, 1990. The Board, excluding a Berkeley representative, met on March 28, 1990, to approve a job training plan. On April 12, 1990, the plan was submitted to the Governor.

The Governor disapproved the plan, due to the lack of approval and submission of the plan by all of the required parties, pursuant to 29 U.S.C. § 1515(b) which provides in relevant part:

(1) The Governor shall approve the job training plan or modification thereof unless he finds that—

.    .    .    .    .

(D) the plan (or modification) does not comply with a particular provision or provisions of this chapter or of regulations of the Secretary under this chapter....

Specifically, the Governor concluded that the plan did not comply with § 1513(d) *see infra*, because it was approved only in concept by the full Board before Berkeley's resignation became effective, and was actually approved and submitted after Berkeley's withdrawal. The Board appealed to the Secretary. The Secretary concluded that although the plan "arguably" had been "legitimately approved" by all the necessary parties, it "was not submitted to the Governor by [Berkeley] as required by [§ 1513(d)]." The Secretary, therefore, affirmed the Governor's decision. The Board petitioned for review of the Secretary's decision. Berkeley filed an amicus curiae brief. We have jurisdiction pursuant to 29 U.S.C. § 1578(a)(1).

## DISCUSSION

Our review is "limited to questions of law and the Secretary's findings of fact shall be conclusive if supported by substantial evidence." 29 U.S.C. § 1578(a)(3) (1988). The determinative issue is whether § 1513(d)(2)'s requirement that the job training plan be submitted jointly by the private industry council and the appropriate chief elected officials was complied with when the Board submitted it after Berkeley's withdrawal. We conclude that the joint submission requirement was not satisfied. We therefore need not decide the more difficult issues of whether the

Act allows for individual units of local government to agree to representative action by an entity like the Board, and whether the plan was appropriately approved by the Board given that the Board acted during the window period after Berkeley had given notice but before its withdrawal had taken effect. Our decision is based on the relevant sections of the Act.

Section 1513(d) provides:

No job training plan ... may be submitted to the Governor unless (1) the plan has been approved by the [private industry] council and by the appropriate chief elected official or officials specified in subsection (c) of this section, and (2) the plan is submitted jointly by the council and such official or officials.

In turn, the relevant portion of subsection (c) provides:

[T]he appropriate chief elected official or officials means—

.     .     .     .     .

(2) the individual or individuals selected by the chief elected officials of all units of general local government in such area as their authorized representative ...

Although arguably the Board initially was made up of authorized representatives from all fourteen units, thus rendering the Board one of two required submitting parties (the private industry council being the other), the Board lost that status when Berkeley's withdrawal became effective on April 6, 1990, six days before the Board submitted the plan to the Governor. Thus, the April 12 submission did not comply with § 1513(d). Pursuant to § 1515(b) which allows the Governor to disapprove a plan if it "does not comply with a particular provision of [the Act]," Governor Deukmejian disapproved the Board's plan due to its lack of compliance with § 1513(d).

This case is that simple despite the Board's numerous arguments to the contrary. One such argument focuses on the Act's gubernatorial redesignation authority. Congress in setting up the administration of the Act envisioned that all governmental units within a service delivery area would work together and, in the event that there was initial disagreement, the units would compromise. Otherwise, the service delivery area would not receive funding. Realizing that political realities sometimes render compromise impossible, Congress created a safety valve, § 1515(c), which states in relevant part:

(1) If a private industry council and the appropriate chief elected official or officials fail to reach the agreement required under section 1513(b) or (d) [the subsection requiring joint approval and submission] of this title and, as a consequence, funds for a service delivery area may not be made available under section 1514 of this title, then the Governor shall redesignate, without regard to sections 1511(a)(4) and (c)(1) of this title, the service delivery areas in the State to merge the affected area into one or more other service delivery areas, in order to promote the reaching of agreement.

In short, the Governor plays parent and separates the quarreling participants.

The Board suggests that if the Governor exercises his § 1515(c)(1) redesignation authority, he will effectively "punish the [Board]." On the contrary, if the Governor redesignates, presumably the Board will not have to deal with Berkeley anymore. If the Board fears that it will lose its constituency and expertise upon dissolution, presumably it will have an opportunity to present that concern to the Governor before redesignation.

Alternatively, the Board argues that the Governor disapproved the plan "to avoid his own statutory duty to decide ... if Berkeley should be given its own separate service delivery area." The Governor's disapproval of the plan, however, seems to be the first step toward redesignation because the § 1515(c)(1) redesignation authority becomes applicable only when the local governmental units fail to reach an agreement. What ultimately caused the Governor's disapproval was the unit's inability to submit the plan as required by the statute which in turn was caused by Berkeley and the Board's failure to reach a new "side" agreement.

Another extraneous argument presented by the Board is that because the service delivery area was established pursuant to the mandatory requirement of § 1511(a)(4)(A)(ii),[1] the Governor cannot now "junk it." The redesignation authority, however, is designed to prevent "junking" of an entire service delivery area. Rather than let a service delivery area remain in an impasse and consequently not receive federal funds to administer its program, § 1515 mandates that the Governor redesignate "without regard to section[ ] 1511(a)(4) … in order to promote the reaching of agreement." 29 U.S.C. § 1515(c)(1). Indeed, the Board requests that if we do not reverse the Secretary's decision, we redesignate the service delivery area. Although this is probably what will ultimately correct the problem, that authority is vested with the Governor, not with us.

Finally, the Board attacks the validity of the "pass-through" agreement pursuant to which Berkeley essentially operated as a "service delivery area within a service delivery area," receiving money through the Board but administering its own job training program. Although the "pass-through" agreement arguably might have contravened Congress's intent that members of a service delivery area work together to develop and administer a plan, (Berkeley argues that "pass-through" agreements are not unusual, that issue is not appropriately before us.

A variation on the Board's challenge to the "pass-through" agreement is its argument that Berkeley's veto power (presumably its ability to withdraw) contravenes the agreement among the fourteen units which provides for simple majority rule. This argument is specious as the "veto" authority was agreed to by all fourteen units. They cannot now avoid power that they themselves gave Berkeley by arguing that it contravenes their agreement of ma-

jority rule. The Board argues that this effective veto power creates an undue burden on interstate commerce, citing *Garcia v. San Antonia Metro. Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). This argument is not adequately developed, nor does it appear to have any merit.

### CONCLUSION

Although it is unclear whether the plan was appropriately approved, it is clear that the plan was not submitted by all fourteen units of local government in the service delivery area as required by 29 U.S.C. § 1513(d). We therefore deny the Board's petition for review of the Secretary's affirmance of the Governor's disapproval of the Board's plan.[2]

PETITION DENIED.

---

1. Section 1511(a)(4)(A)(ii) provides:
   The Governor shall approve any request to be a service delivery area from—
   .    .    .    .    .
   (ii) any consortium of contiguous units of general local government with an aggregate

population of 200,000 or more which serves a substantial part of a labor market area....

2. Due to our disposition of this case, the Board's request for attorneys' fees and costs is denied, as is its unsupported request for sanctions.